## JENCKS *v.* UNITED STATES.

No. 23.   Argued October 17, 1956.—Decided June 3, 1957.

*John T. McTernan* argued the cause for petitioner. With him on the brief was *Nathan Witt*.

*John V. Lindsay* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Tompkins, Clinton B. D. Brown* and *Harold D. Koffsky*.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

On April 28, 1950, the petitioner, as president of Amalgamated Bayard District Union, Local 890, International Union of Mine, Mill & Smelter Workers, filed an "Affidavit of Non-Communist Union Officer" with the National Labor Relations Board, pursuant to § 9 (h) of the National Labor Relations Act.[1] He has been convicted under a two-count indictment charging that he

---

[1] 61 Stat. 143, 146, as amended, 65 Stat. 602, 29 U. S. C. § 159 (h).

Section 9 (h) provides that processes of the National Labor Relations Board will be unavailable to a labor organization ". . . unless there is on file with the Board an affidavit executed . . . by each officer of such labor organization . . . that he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods. . . ."

violated 18 U. S. C. § 1001 [2] by falsely swearing in that affidavit that he was not on April 28, 1950, a member of the Communist Party or affiliated with such Party. The Court of Appeals for the Fifth Circuit affirmed the conviction,[3] and also an order of the District Court denying the petitioner's motion for a new trial.[4] This Court granted certiorari.[5]

Two alleged trial errors are presented for our review. Harvey F. Matusow and J. W. Ford, the Government's principal witnesses, were Communist Party members paid by the Federal Bureau of Investigation contemporaneously to make oral or written reports of Communist Party activities in which they participated. They made such reports to the F. B. I. of activities allegedly participated in by the petitioner, about which they testified at the trial. Error is asserted in the denial by the trial judge of the petitioner's motions to direct the Government to produce these reports for inspection and use in cross-examining Matusow and Ford. Error is also alleged in the instructions given to the jury on membership, affiliation, and the credibility of informers.[6]

Former Party members testified that they and the petitioner, as members of the Communist Party of New Mexico, had been expressly instructed to conceal their membership and not to carry membership cards. They also testified that the Party kept no membership records or minutes of membership meetings, and that such meetings were secretly arranged and clandestinely held. One of the witnesses said that special care was taken to conceal the Party membership of members, like the peti-

---

[2] 62 Stat. 749.

[3] 226 F. 2d 540.

[4] 226 F. 2d 553.

[5] 350 U. S. 980.

[6] Because of our disposition of this case, it is unnecessary to consider the alleged errors in these instructions.

tioner, "occupying strategic and important positions in labor unions and other organizations where public knowledge of their membership to non-Communists would jeopardize their position in the organization." Accordingly, the Government did not attempt to prove the petitioner's alleged membership in the Communist Party on April 28, 1950, with any direct admissions by the petitioner of membership, by proof of his compliance with Party membership requirements, or that his name appeared upon a membership roster, or that he carried a membership card.

The evidence relied upon by the Government was entirely circumstantial. It consisted of testimony of conduct of the petitioner from early 1946 through October 15, 1949, and of Matusow's testimony concerning alleged conversations between him and the petitioner at a vacation ranch in July or August 1950, and concerning a lecture delivered by the petitioner at the ranch. The Government also attached probative weight to the action of the petitioner in executing and filing an Affidavit of Non-Communist Union Officer on October 15, 1949, because of the events surrounding the filing of that affidavit. The Government bridged the gap between October 15, 1949, and July or August 1950 with the testimony of Ford that, during that period, the Party took no disciplinary action against the petitioner for defection or deviation, and did not replace the petitioner in the Party office which Ford testified the petitioner held as a member of the Party State Board.

The first alleged Party activity of the petitioner preceded his union employment. A witness, who was a Party member in the spring of 1946, testified that, at that time, he and the petitioner were present at a closed Party meeting at the home of the Party chairman for Colorado, where the petitioner, a veteran of World War II, led in urging that veterans who were Party members spread out

into several veterans' organizations and not all join the same one, the better to further Party work.

Later in 1946 the petitioner was employed by the International Union of Mine, Mill & Smelter Workers as business agent for several local unions in the Silver City-Bayard, New Mexico, area. It was testified that one of the petitioner's first acts was to meet with the International Union's then Regional Director for the Southwest, a Communist Party member, and with the Communist Party organizer for the area, to develop plans for organizing a Party group within each of those locals, which later merged to form Amalgamated Local 890 under the petitioner's presidency.

J. W. Ford was a member of the Communist Party of New Mexico from 1946 to September 1950 and, from 1948, was a member of the State Board and a Party security officer. He said that in 1948 he became a paid undercover agent for the F. B. I.[7] and reported regularly upon Party activities and meetings. He testified that the petitioner was also a Party and a State Board member, and he related in detail occurrences at five closed Party meetings which he said the petitioner attended.

At the first meeting, in August 1948, Ford said the Party members worked out a plan to support the petitioner's candidacy for Congress on the ticket of the Progressive Party. At the second meeting, in February 1949, Ford said that the petitioner and other Communist Party members were appointed delegates to a meeting of the Mexican-American Association in Phoenix, Arizona, to further a Party plan to infiltrate that organization and to use it for the Party's purposes. At the third meeting, in April 1949, Ford said that the Party's state organiza-

---

[7] From 1948 through 1953, Ford was paid $7,025 for his services. Of that sum, approximately $3,325 covered the period to which his testimony related.

tion was completed, and the petitioner was appointed to the State Board and the Party leader in the southern half of the State. At the fourth meeting, in May 1949, Ford said that the petitioner gave a progress report upon his success in recruiting Party members among labor groups, and offered to use Local 890's newspaper, "The Union Worker," which he edited, to support issues of Party interest. At the fifth meeting, in August 1949, Ford said that preparations were made for another meeting later in that month of the Mexican-American Association in Albuquerque, and that the delegates, including the petitioner, were instructed to give vigorous support to the meeting but to take care not to make themselves conspicuous in the proceedings.

Ford's duties as a Party security officer were to keep watch on all Party members and to report "any particular defections from the Communist philosophy or any peculiar actions, statements or associations, which would endanger the security of the Communist Party of the state." If any defection reported by a security officer were considered important, the member "would be called in and would be either severely reprimanded or criticized, or disciplined. If he refused to accept such discipline he would either be suspended or expelled." Ford testified that, between August 1949 and September 1950, when Ford ceased his activities with the New Mexico Party, there was no disciplinary action taken against the petitioner and, to his knowledge, the petitioner was not replaced in his position on the State Board of the Communist Party.

The events leading up to the petitioner's execution and filing, on October 15, 1949, of an Affidavit of Non-Communist Union Officer were testified to by a former International Union representative, a Communist Party member during 1947 to 1949. He said that, about 17

months before, in May or June 1948, a meeting of Party members, holding offices in locals of the International Union of Mine, Mill & Smelter Workers, was held in Denver to formulate plans for combatting a movement, led by non-Communists, to secede from the International Union. He said that the Party members, including the petitioner, were informed of Party policy not to sign affidavits required by § 9 (h) of the then recently enacted Taft-Hartley Act. There was no testimony that that policy changed before October 15, 1949.

The affidavit was filed shortly before a C. I. O. convention was scheduled to expel the Mine-Mill International and other unions from its membership. After filing the affidavit, the petitioner and other Local 890 officers published an article in "The Union Worker" charging that the contemplated C. I. O. action was part of a program of "right-wing unions . . . gobbling up chunks of militant unions. . . . Our International Union and its officers have swallowed a lot of guff, a lot of insults. But that is not the point. . . . Now that our Union has signed the phony affidavits we can defend ourselves . . . in case of raids. We do not fear attack from that quarter any longer."

Matusow was a member of the Communist Party of New York and was a paid undercover agent for the F. B. I. before he went to New Mexico.[8] In July or August 1950, he spent a 10-day vacation on a ranch near Taos, New Mexico, with the petitioner and a number of other people. He testified to several conversations with the petitioner there. He said he twice told the petitioner of his desire to transfer his membership from the New York to the New Mexico Party, and that on both occa-

---

[8] Other activities of Matusow are described in *Communist Party of the United States* v. *Subversive Activities Control Board*, 351 U. S. 115, and *United States* v. *Flynn*, 130 F. Supp. 412.

sions the petitioner applauded the idea and told him, "we can use you out here, we need more active Party members." On one of these occasions, Matusow said, the petitioner asked him for suggestions for a lecture the petitioner was preparing for delivery at the ranch, particularly as to what the New York Communists were doing about the Stockholm Peace Appeal. Matusow described to the petitioner a "do-day" program adopted in New York when the Party members were doers, not talkers, and performed some activity, such as painting signs around a baseball stadium urging support for the Peace Appeal. He testified that the petitioner showed great interest in the idea and said he might bring it back to his fellow Party members in Silver City.

Matusow testified that the petitioner delivered his planned lecture, informed his audience of the "do-day" idea, praised the Soviet Union's disarmament plan, referred to the United States as the aggressor in Korea, and urged all to read the "Daily People's World," identified by Matusow as the "West Coast Communist Party newspaper." Another witness, an expelled member of Amalgamated Local 890, testified that petitioner, during 1950, 1951 and 1952, repeatedly urged at union meetings that the union members read that paper.

Matusow also testified that, in one of their conversations, the petitioner told him of a program he was developing with leaders of the Mexican Miners Union to negotiate simultaneous expiration dates of collective bargaining agreements, to further a joint action of Mexican and American workers to cut off production to slow down the Korean War effort. Matusow also testified that when he told the petitioner that he had joined the Taos Chapter of the Mexican-American Association, the petitioner told him that this was proper Communist work because the Association was a key organization, con-

trolled by the Party, for Communist activities in New Mexico and that he, the petitioner, was active in the Association in the Silver City area.[9]

Ford and Matusow were subjected to vigorous cross-examination about their employment as informers for the F. B. I. Ford testified that in 1948 he went to the F. B. I. and offered his services, which were accepted. He thereafter regularly submitted reports to the F. B. I., "sometimes once a week, sometimes once a month, and at various other times; maybe three or four times a week, depending on the number of meetings . . . [he] attended and the distance between the 'meetings." He said that his reports were made immediately following each meeting, while the events were still fresh in his memory. He could not recall, however, which reports were oral and which in writing.

The petitioner moved "for an order directing an inspection of reports of the witness Ford to the Federal Bureau of Investigation dealing with each of the meetings which he said that he attended with the defendant Jencks in the years 1948 and 1949." The trial judge, without stating reasons, denied the motion.

Matusow, on his cross-examination, testified that he made both oral and written reports to the F. B. I. on events at the ranch, including his conversations with the petitioner. The trial judge, again without reasons, denied the motion to require "the prosecution to produce in Court the reports submitted to the F. B. I. by this witness [Matusow] concerning matters which he saw or

---

[9] Matusow recanted as deliberately false the testimony given by him at the trial. On the basis of this recantation, the petitioner moved for a new trial, while his appeal from the conviction was pending, on grounds of newly discovered evidence. After extended hearings, the District Court denied the motion.

heard at the . . . Ranch during the period that he was a guest there . . . ."[10]

The Government opposed petitioner's motions at the trial upon the sole ground that a preliminary foundation was not laid of inconsistency between the contents of the reports and the testimony of Matusow and Ford. The Court of Appeals rested the affirmance primarily upon that ground.[11]

Both the trial court and the Court of Appeals erred. We hold that the petitioner was not required to lay a preliminary foundation of inconsistency, because a sufficient foundation was established by the testimony of Matusow and Ford that their reports were of the events and activities related in their testimony.

The reliance of the Court of Appeals upon *Gordon* v. *United States,* 344 U. S. 414, is misplaced. It is true that one fact mentioned in this Court's opinion was that the witness admitted that the documents involved contradicted his testimony. However, to say that *Gordon* held a preliminary showing of inconsistency a prerequisite to an accused's right to the production for inspection of documents in the Government's possession, is to misinterpret the Court's opinion. The necessary essentials of a foundation, emphasized in that opinion, and present

---

[10] During the hearings on the motion for a new trial, the petitioner made several requests for the production of documents in the possession of the Government, relating to the testimony given. These motions were denied. Because of our disposition of this case, it is unnecessary to consider these rulings.

[11] In upholding the refusal to require the production of the reports, the Court of Appeals said:

". . . Upon a proper showing that the Government has possession of such inconsistent statements and the presence of the other requisite conditions, a person charged with crime would be permitted to examine and use them. But no such showing was made here . . . ." 226 F. 2d, at 552.

here, are that "[t]he demand was for production of . . . *specific documents and did not propose any broad or blind fishing expedition* among documents possessed by the Government on the chance that something impeaching might turn up. Nor was this a demand for statements taken from persons or informants not offered as witnesses." (Emphasis added.) 344 U. S., at 419. We reaffirm and re-emphasize these essentials. "For production purposes, it need only appear that the evidence is relevant, competent, and outside of any exclusionary rule . . . ." 344 U. S., at 420.

The crucial nature of the testimony of Ford and Matusow to the Government's case is conspicuously apparent. The impeachment of that testimony was singularly important to the petitioner. The value of the reports for impeachment purposes was highlighted by the admissions of both witnesses that they could not remember what reports were oral and what written, and by Matusow's admission: "I don't recall what I put in my reports two or three years ago, written or oral, I don't know what they were."

Every experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory. Flat contradiction between the witness' testimony and the version of the events given in his reports is not the only test of inconsistency. The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony.

Requiring the accused first to show conflict between the reports and the testimony is actually to deny the accused evidence relevant and material to his defense. The occasion for determining a conflict cannot arise until

after the witness has testified, and unless he admits conflict, as in *Gordon,* the accused is helpless to know or discover conflict without inspecting the reports.[12]  A requirement of a showing of conflict would be clearly incompatible with our standards for the administration of criminal justice in the federal courts and must therefore be rejected.  For the interest of the United States in a criminal prosecution ". . . is not that it shall win a case, but that justice shall be done. . . ."  *Berger* v. *United States,* 295 U. S. 78, 88.[13]

This Court held in *Goldman* v. *United States,* 316 U. S. 129, 132, that the trial judge had discretion to deny inspection when the witness ". . . does not use his notes or memoranda [relating to his testimony] in court . . . ". We now hold that the petitioner was entitled to an order directing the Government to produce for inspection all reports of Matusow and Ford in its possession, written and, when orally made, as recorded by the F. B. I., touching the events and activities as to which they testified at the trial.  We hold, further, that the petitioner is entitled to inspect the reports to decide whether to use them in his defense.  Because only the defense is adequately equipped to determine the effective use for

---

[12] Cf. *United States* v. *Burr,* 25 Fed. Cas. 187, wherein Chief Justice Marshall, when confronted with a request for the inspection of a letter addressed to the President and in the possession of the attorney for the United States, stated:

"Now, if a paper be in possession of the opposite party, what statement of its contents or applicability can be expected from the person who claims its production, he not precisely knowing its contents? . . .

". . . It is objected that the particular passages of the letter which are required are not pointed out.  But how can this be done while the letter itself is withheld? . . ."  25 Fed. Cas., at 191.

[13] *United States* v. *Schneiderman,* 106 F. Supp. 731; *People* v. *Dellabonda,* 265 Mich. 486, 251 N. W. 594; see Canon 5, American Bar Association, Canons of Professional Ethics (1947).

purpose of discrediting the Government's witness and thereby furthering the accused's defense, the defense must initially be entitled to see them to determine what use may be made of them. Justice requires no less.[14]

The practice of producing government documents to the trial judge for his determination of relevancy and materiality, without hearing the accused, is disapproved.[15] Relevancy and materiality for the purposes of production and inspection, with a view to use on cross-examination, are established when the reports are shown to relate to the testimony of the witness. Only after inspection of the reports by the accused, must the trial judge determine admissibility—*e. g.,* evidentiary questions of inconsistency, materiality and relevancy—of the contents and the method to be employed for the elimination of parts immaterial or irrelevant. See *Gordon* v. *United States,* 344 U. S., at 418.

In the courts below the Government did not assert that the reports were privileged against disclosure on grounds of national security, confidential character of the reports,

---

[14] Chief Justice Marshall also said in *United States* v. *Burr,* 25 Fed. Cas. 187:

"Let it be supposed that the letter may not contain anything respecting the person now before the court. Still it may respect a witness material in the case, and become important by bearing on his testimony. Different representations may have been made by that witness, or his conduct may have been such as to affect his testimony. In various modes a paper may bear upon the case, although before the case be opened its particular application cannot be perceived by the judge. . . ." 25 Fed. Cas., at 191.

What is true before the case is opened is equally true as the case unfolds. The trial judge cannot perceive or determine the relevancy and materiality of the documents to the defense without hearing defense argument, after inspection, as to its bearing upon the case.

[15] See, *e. g., United States* v. *Grayson,* 166 F. 2d 863, 869; *United States* v. *Beekman,* 155 F. 2d 580, 584; *United States* v. *Ebeling,* 146 F. 2d 254, 256; *United States* v. *Cohen,* 145 F. 2d 82, 92; *United States* v. *Krulewitch,* 145 F. 2d 76, 78.

public interest or otherwise. In its brief in this Court, however, the Government argues that, absent a showing of contradiction, "[t]he rule urged by petitioner . . . disregards the legitimate interest that each party—including the Government—has in safeguarding the privacy of its files, particularly where the documents in question were obtained in confidence. Production of such documents, even to a court, should not be compelled in the absence of a preliminary showing by the party making the request." The petitioner's counsel, believing that Court of Appeals' decisions imposed such a qualification, restricted his motions to a request for production of the reports to the trial judge for the judge's inspection and determination whether and to what extent the reports should be made available to the petitioner.

It is unquestionably true that the protection of vital national interests may militate against public disclosure of documents in the Government's possession. This has been recognized in decisions of this Court in civil causes where the Court has considered the statutory authority conferred upon the departments of Government to adopt regulations "not inconsistent with law, for . . . use . . . of the records, papers . . . appertaining" to his department.[16] The Attorney General has adopted regulations pursuant to this authority declaring all Justice Department records confidential and that no disclosure, including disclosure in response to subpoena, may be made without his permission.[17]

But this Court has noticed, in *United States* v. *Reynolds,* 345 U. S. 1, the holdings of the Court of Appeals

---

[16] R. S. § 161, 5 U. S. C. § 22; *United States* v. *Reynolds,* 345 U. S. 1; cf. *Totten* v. *United States,* 92 U. S. 105.

[17] Atty. Gen. Order No. 3229 (1939), 28 CFR, 1946 Supp., § 51.71; Atty. Gen. Order No. 3229, Supp. 2, Pike & Fischer Admin. Law 2d, Dept. of Justice 1 (1947); Atty. Gen. Order No. 3229, Rev., 18 Fed. Reg. 1368 (1953).

for the Second Circuit [18] that, in criminal causes ". . . the Government can invoke its evidentiary privileges only at the price of letting the defendant go free. The rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense. . . ." 345 U. S., at 12.

In *United States* v. *Andolschek,* 142 F. 2d 503, 506, Judge Learned Hand said:

". . . While we must accept it as lawful for a department of the government to suppress documents, even when they will help determine controversies between third persons, we cannot agree that this should include their suppression in a criminal prosecution, founded upon those very dealings to which the documents relate, and whose criminality they will, or may, tend to exculpate. So far as they directly touch the criminal dealings, the prosecution necessarily ends any confidential character the documents may possess; it must be conducted in the open, and will lay bare their subject matter. The government must choose; either it must leave the transactions in the obscurity from which a trial will draw them, or it must expose them fully. Nor does it seem to us possible to draw any line between documents whose contents bears directly upon the criminal transactions, and those which may be only indirectly relevant. Not only would such a distinction be extremely difficult to apply in practice, but the same reasons which forbid suppression in one case forbid it in the other, though not, perhaps, quite so imperatively. . . ."

---

[18] *United States* v. *Beekman,* 155 F. 2d 580; *United States* v. *Andolschek,* 142 F. 2d 503.

We hold that the criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at the trial. Accord, *Roviaro* v. *United States,* 353 U. S. 53, 60–61. The burden is the Government's, not to be shifted to the trial judge, to decide whether the public prejudice of allowing the crime to go unpunished is greater than that attendant upon the possible disclosure of state secrets and other confidential information in the Government's possession.

*Reversed.*

MR. JUSTICE FRANKFURTER joins the opinion of the Court, but deeming that the questions relating to the instructions to the jury should be dealt with, since a new trial has been directed, he agrees with the respects in which, and the reasons for which, MR. JUSTICE BURTON finds them erroneous.

MR. JUSTICE WHITTAKER took no part in the consideration or decision of this case.

MR. JUSTICE BURTON, whom MR. JUSTICE HARLAN joins, concurring in the result.

Because of the importance of this case to the administration of criminal justice in the federal courts, I believe it appropriate to set forth briefly the different route by which I reach the same result as does the Court.

Ford and Matusow, as the Court's opinion indicates, were crucial government witnesses because their testimony supplied the principal evidence relating to the period immediately surrounding the filing of petitioner's allegedly false affidavit. Cross-examination brought out

the fact that each had made oral or written reports to the Federal Bureau of Investigation relating to the respective events about which each had testified on direct examination. Having established that fact, petitioner sought an order requiring the Government to produce, for inspection by the court, the reports relating to those matters about which each witness had testified. The procedure to be followed was carefully specified: the court was to determine whether the reports had evidentiary value for impeachment of the credibility of Ford or Matusow; if the court found that they had value for that purpose, it was then to make them available to petitioner for his use in cross-examination. The Government opposed each motion on the ground that no showing of contradiction between the witness' testimony and his reports had been made as required by a controlling Fifth Circuit decision, *Shelton* v. *United States,* 205 F. 2d 806. Apparently on that ground, the trial court denied the motions.

Petitioner's requests were limited to a narrow category of reports dealing with specified meetings and conversations. The purpose of the requests—to impeach the credibility of crucial government witnesses—was made clear. Petitioner did not ask to inspect the documents himself; he sought access only to those portions of the reports which the trial court might determine to have evidentiary value for impeachment purposes, and to be unprivileged.[1]

---

[1] In his brief, petitioner states:
"Petitioner asked only that the reports be produced to the trial judge so that he could examine them and determine whether they had evidentiary value for impeachment purposes. Petitioner sought access only to those portions of the reports having this value. The motion therefore proposed no broad foray into the government's files and afforded the judge every opportunity to protect the government's legitimate privilege as to the matters not connected with this case."

I agree that, under such circumstances, it was unnecessary for petitioner to show that Ford's and Matusow's trial testimony was contradicted in some respect by their contemporaneous reports. Although some federal courts have required a showing of contradiction,[2] this Court never has done so.[3] A rule requiring a showing of contradiction in every case would not serve the ends of justice. I concur, therefore, in that portion of the Court's opinion holding that petitioner laid a sufficient foundation for the production of the reports.

I would not, however, replace the inflexible and narrow rule adopted by the courts below with the broader, but equally rigid rule announced by the Court. In matters relating to the production of evidence or the scope of cross-examination, a "large discretion must be allowed the trial judge." *Goldman* v. *United States,* 316 U. S. 129, 132; *Glasser* v. *United States,* 315 U. S. 60, 83; *Alford* v. *United States,* 282 U. S. 687, 694. The appropriate determination of a motion to produce reports made in connection with the examination of a witness depends upon the significance of the facts sought to be established,

---

[2] *Scanlon* v. *United States,* 223 F. 2d 382, 385-386; *Shelton* v. *United States,* 205 F. 2d 806, 814–815; *Christoffel* v. *United States,* 91 U. S. App. D. C. 241, 244–247, 200 F. 2d 734, 737–739, rev'd on other grounds, 345 U. S. 947; *D'Aquino* v. *United States,* 192 F. 2d 338, 375; *United States* v. *De Normand,* 149 F. 2d 622, 625–626; *United States* v. *Ebeling,* 146 F. 2d 254, 257; *Little* v. *United States,* 93 F. 2d 401; *Arnstein* v. *United States,* 54 App. D. C. 199, 203, 296 F. 946, 950.

[3] In *Gordon* v. *United States,* 344 U. S. 414, the petitioners had shown that written statements given to government agents by a key government witness contradicted the witness' trial testimony. In holding that the trial court erred in denying petitioners' motion for the production and inspection of these statements, the Court was deciding that case on its facts. I do not regard it as establishing a rule that a showing of contradiction is an essential element of the foundation precedent to production.

and upon the potential use of the requested document in proving those facts. Since that determination depends on "numerous and subtle considerations difficult to detect or appraise from a cold record . . . ," the trial court's discretion should be upheld in the absence of a "clear showing of prejudicial abuse of discretion . . . ." Cf. *Michelson* v. *United States,* 335 U. S. 469, 480. We have so held even when the documents sought to be produced have been used at the trial for the purpose of refreshing a witness' recollection. *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 232–234. When the documents have not been so used and are sought only to impeach the credibility of adverse witnesses, and not to prove the facts stated therein, the same conclusion is even more compelling.

The Court goes beyond the request of petitioner that reports be produced for examination by the trial court and, in effect, seems to hold that the Government waives any privileges it may have with respect to documents in its possession by placing the author of those documents on the witness stand in a criminal prosecution. The Government's privileges with respect to state secrets and the identity of confidential informants embody important considerations of public policy. They are peculiar privileges in that they require the withholding of evidence not only from the jury, but also from the defendant. See *Roviaro* v. *United States,* 353 U. S. 53 (identity of informers); *Reynolds* v. *United States,* 345 U. S. 1 (state secrets). Once the defendant learns the state secret or the identity of the informer, the underlying basis for the privilege disappears, and there usually remains little need to conceal the privileged evidence from the jury. Thus, when the Government is a party, the preservation of these privileges is dependent upon nondisclosure of the privileged evidence to the defendant. This makes it

necessary for the trial court, before disclosing the privileged material to the defendant, to pass on the question by examining *in camera* the portions claimed to be privileged. Cf. *Bowman Dairy Co.* v. *United States,* 341 U. S. 214, 221. There is nothing novel or unfair about such a procedure. According to Wigmore, it is customary.

> ". . . it is obviously not for the witness to withhold the documents upon his mere assertion that they are not relevant or that they are privileged. The question of Relevancy is never one for the witness to concern himself with; nor is the applicability of a privilege to be left to his decision. It is his duty to bring what the Court requires; and the Court can then to its own satisfaction determine by inspection whether the documents produced are irrelevant or privileged. *This does not deprive the witness of any rights of privacy, since the Court's determination is made by its own inspection, without submitting the documents to the opponent's view . . . .*" (Emphasis deleted and supplied.) VIII Wigmore, Evidence (3d ed. 1940), 117–118.

Numerous federal decisions have followed this practice with respect to the type of documents here involved—contemporaneous reports made by a government investigator or informer who later testifies at the trial.[4] This procedure protects the legitimate public interest in safeguarding executive files. It also respects the interests of justice by permitting an accused to receive all informa-

---

[4] See, *e. g., United States* v. *Coplon,* 185 F. 2d 629, 638; *United States* v. *Beekman,* 155 F. 2d 580, 584; *United States* v. *Cohen,* 145 F. 2d 82, 92; *United States* v. *Krulewitch,* 145 F. 2d 76, 79; *United States* v. *Flynn,* 130 F. Supp. 412; *United States* v. *Mesarosh,* 116 F. Supp. 345, 350; *United States* v. *Schneiderman,* 106 F. Supp. 731, 735–738.

tion necessary to his defense. The accused is given an opportunity to argue that the privilege asserted by the Government is inapplicable and that, even if applicable, his need for the evidence, under the circumstances of the case, outweighs the Government's interest in maintaining secrecy. The problem is closely related to that involved in *Roviaro* v. *United States, supra,* dealing with the necessity of the disclosure of an informer's identity in a criminal case. There this Court said:

> "[N]o fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders non-disclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." 353 U. S., at 62.

The trial judge exercises his discretion with knowledge of the issues involved in the case, the nature and importance of the Government's interest in maintaining secrecy, and the defendant's need for disclosure. By vesting this discretion in the trial judge, the conflicting interests are balanced, and a just decision is reached in the individual case without needless sacrifice of important public interests.[5]

---

[5] Privileged material sometimes can be excised from the reports without destroying their value to the defendant. Only when deletion is impracticable is the court compelled to choose between disclosing the document as a whole and withholding it completely. Material withheld from the defendant should be sealed as part of the record so that an appellate court may review the action of the trial court and correct any abuse of discretion.

I also disagree with the Court's holding that the failure to produce the records to petitioner necessitates a new trial. Petitioner requested only that the records be produced to the trial court.[6] He is entitled to no more. Whether a new trial is required should depend on the contents of the requested reports. If the reports contain material that the trial court finds has evidentiary value to petitioner, a new trial should be granted in order that petitioner may use it. But if the reports do not contain contradictory or exculpatory material helpful to petitioner, no possible prejudice could have resulted from the trial court's denials of petitioner's motions.[7] Were it not for the fact that I believe the trial court committed reversible error in instructing the jury with respect to the meaning of membership and affiliation, I would vacate the judgment below and remand to the trial court with instructions to examine the reports and to determine, in the light of the entire record, whether the failure to produce the reports was prejudicial to petitioner.[8]

However, I believe the trial court failed to give the jury sufficient guidance with respect to the meaning of the phrases "member of the Communist Party," and

---

[6] See n. 1, *supra*.

[7] Rule 52 (a) of the Federal Rules of Criminal Procedure provides: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." See *Lutwak* v. *United States,* 344 U. S. 604, 619; *Kotteakos* v. *United States,* 328 U. S. 750, 756–777. There are many cases in which nonproduction of documents has been held to be harmless error. Three comparatively recent cases, dealing with reports of law-enforcement officers are *United States* v. *Sansone,* 231 F. 2d 887; *Montgomery* v. *United States,* 203 F. 2d 887, 893–894; and *Bundy* v. *United States,* 90 U. S. App. D. C. 12, 193 F. 2d 694.

[8] The trial court is the appropriate forum to consider the possible prejudicial effect of the error. See, *e. g., Communist Party* v. *Subversive Activities Control Board,* 351 U. S. 115; *Remmer* v. *United States,* 347 U. S. 227.

"affiliated with such party" as they are used in § 9 (h) of the Labor Management Relations Act, 61 Stat. 146, 29 U. S. C. § 159 (h). The instruction given as to membership was as follows:

> "In considering whether or not the defendant was a member of the Communist Party, you may consider circumstantial evidence, as well as direct. You may consider whether or not he attended Communist Party meetings, whether or not he held an office in the Communist Party, whether or not he engaged in other conduct consistent only with membership in the Communist Party and all other evidence, either direct or circumstantial, which bears or may bear upon the question of whether or not he was a member of the Communist Party on April 28, 1950."

This instruction failed to emphasize to the jury the essential element of membership in an organized group—the desire of an individual to belong to the organization and a recognition by the organization that it considers him as a member.[9]

The instruction on affiliation also was defective. After quoting dictionary definitions employing synonymous words, the trial court merely said: "Affiliation . . . means something less than membership but more than sympathy. Affiliation with the Communist Party may be proved by either circumstantial or direct evidence, or both." This instruction allowed the jury to convict petitioner on the basis of acts of intermittent cooperation. It did not require a continuing course of conduct "on a fairly permanent basis" "that could not be abruptly ended without

---

[9] *Fisher* v. *United States*, 231 F. 2d 99, 106–107. See also, *Ocon* v. *Guercio*, 237 F. 2d 177; *Baghdasarian* v. *United States*, 220 F. 2d 677; *Sigurdson* v. *Landon*, 215 F. 2d 791; *Dickhoff* v. *Shaughnessy*, 142 F. Supp. 535.

giving at least reasonable cause for the charge of a breach of good faith." [10]

Because of these errors in the instructions, petitioner is entitled to a new trial. Accordingly, I concur in the judgment of the Court.

MR. JUSTICE CLARK, dissenting.

The Court holds "that the criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at the trial." This fashions a new rule of evidence which is foreign to our federal jurisprudence. The rule has always been to the contrary. It seems to me that proper judicial administration would require that the Court expressly overrule *Goldman* v. *United States,* 316 U. S. 129, 132 (1942), which is *contra* to the rule announced today. But that is not done. That case is left on the books to haunt lawyers and trial courts in their search for the proper rule. In *Goldman* the Court was unanimous on the issue of disclosure of documents [1] and refused to order produced "notes and memoranda made by the [federal] agents during the investigation." The rule announced today has no support in any of our cases. [2]

---

[10] *United States ex rel. Kettunen* v. *Reimer,* 79 F. 2d 315, 317. See also, *Bridges* v. *Wixon,* 326 U. S. 135; *Fisher* v. *United States,* 231 F. 2d 99, 107–108.

[1] Though the Court was divided on an issue not here material, the two dissenting opinions expressed no disagreement whatsoever on the disclosure issue.

[2] The opinion cites only two of our cases for support. The quotations from *Gordon* v. *United States,* 344 U. S. 414 (1953), an opinion by my late Brother Jackson, a former Solicitor General and Attorney General, are lifted entirely out of context. The case holds explicitly

Every federal judge and every lawyer of federal experience knows that it is not the present rule. Even the defense attorneys did not have the temerity to ask for such a sweeping decision. They only asked that the documents be delivered to the judge for his determination of whether the defendant should be permitted to examine them. This is the procedure followed in some of our circuits. My Brother BURTON has clearly stated in his concurring opinion the manner in which this procedure works. Perhaps here with a recanting witness the trial judge should have examined the specific documents called for, as the defense requested, and if he thought justice required their delivery to the defense, order such delivery to be made. I would have no objection to this being done. But as Brother BURTON points out, this would not require a reversal but merely a vacation of the judgment and a remand to the trial court for that purpose.

Unless the Congress changes the rule announced by the Court today, those intelligence agencies of our Government engaged in law enforcement may as well close up shop, for the Court has opened their files to the criminal and thus afforded him a Roman holiday for rummaging

---

that documents must be produced only after a foundation is laid "showing that the documents were in existence, were in possession of the Government, were made by the Government's witness under examination, were contradictory of his present testimony, and that the contradiction was as to relevant, important and material matters which directly bore on the main issue being tried: the participation of the accused in the crime." *Id.,* at 418–419. Likewise, *United States* v. *Reynolds,* 345 U. S. 1 (1953), by my late Brother Chief Justice Vinson, approved the refusal of the Government to produce documents in a tort claims suit. The opinion gave no approval whatever to the conclusion announced by the majority here. I purposely omitted the reference in the opinion after the penultimate sentence, "Accord, *Roviaro* v. *United States,* 353 U. S. 53, 60–61." That case had to do with the disclosure of a dead informant's name and did not touch on the problem of the disclosure of government documents.

through confidential information as well as vital national secrets. This may well be a reasonable rule in state prosecutions where none of the problems of foreign relations, espionage, sabotage, subversive activities, counterfeiting, internal security, national defense, and the like exist, but any person conversant with federal government activities and problems will quickly recognize that it opens up a veritable Pandora's box of troubles. And all in the name of justice. For over eight score years now our federal judicial administration has gotten along without it and today that administration enjoys the highest rank in the world.

Director J. Edgar Hoover back in 1950 tellingly pointed this out before a Subcommittee of the Committee on Foreign Relations of the United States Senate. Among other things he said, "I have always maintained the view that if we were to fully discharge the serious responsibilities imposed upon us, the confidential character of our files must be inviolate. . . . [U]nless we drastically change or circumscribe our procedures, they should not be disclosed." In describing the files of the Bureau, he continued:

"FBI reports set forth all details secured from a witness. If those details were disclosed, they could become subject to misinterpretation, they could be quoted out of context, or they could be used to thwart truth, distort half-truths, and misrepresent facts. The raw material, the allegations, the details of associations, and compilation of information . . . are of value to an investigator in the discharge of his duty. These files were never intended to be used in any other manner and the public interest would not be served by the disclosure of their contents."

"These files contain complaints, allegations, facts, and statements of all persons interviewed. Depending upon the purpose of the investigation, par-

ticularly in security cases, they contain, not only background data on the individual but details of his private life . . . the identities of our confidential sources of information and full details of investigative techniques. In short, they consist of a running account of all that transpires.

.  .  .  .  .

". . . For want of a more apt comparison, our files can be compared to the notes of a newspaper reporter before he has culled through the printable material from the unprintable. The files do not consist of proven information alone. . . . One report may allege crimes of a most despicable type, and the truth or falsity of these charges may not emerge until several reports are studied, further investigation made, and the wheat separated from the chaff."

"If spread upon the record, criminals, foreign agents, subversives, and others would be forewarned and would seek methods to carry out their activities by avoiding detection and thus defeat the very purposes for which the FBI was created." Hearings before a Subcommittee of the Senate Committee on Foreign Relations on S. Res. 231, 81st Cong., 2d Sess. 327–329.

I can add nothing to this graphic expression of the necessity for the existence of the rule which, until today, kept inviolate investigative reports.

My Brother BURTON's concurrence also points up the failure of the majority to pass upon another important question involved, namely, the sufficiency of the trial judge's instructions. The impact of this failure on him and on my Brother FRANKFURTER was such that they have announced their own views though the majority never reaches the point. For myself alone, I believe that

the instructions on the whole were sufficient. It is unfortunate that the majority does not announce its position. This is only one of some 10 Communist affidavit cases now pending in the trial and appellate courts. Unless this case goes as did Gold's,[3] the question of the sufficiency of instructions will come up in this as well as in each of the other cases. The Court is sorely divided on this important issue and proper judicial administration requires that charges as to what constitutes membership and affiliation in the Communist Party be announced.

---

[3] In *Gold* v. *United States*, 352 U. S. 985 (1957), this Court reversed and remanded the case for a new trial because of official intrusion into the privacy of the jury. The case was dismissed on oral motion of the Government on May 9, 1957.