William H. ANDERSON, Appellant,

v.

UNITED STATES of America, Appellee.

Harry J. HAGEN, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 15899, 15900.

United States Court of Appeals Eighth Circuit.

Jan. 28, 1959.

Rehearing Denied Feb. 26, 1959.

See also, D.C., 154 F.Supp. 374.

Wilton D. Chapman, St. Louis, Mo., for appellant William H. Anderson.

Jerome F. Duggan, St. Louis, Mo. (Sidney W. Horwitz and Dubinsky & Duggan, St. Louis, Mo., on the brief), for appellant Harry J. Hagen.

Murry L. Randall, Asst. U. S. Atty., St. Louis, Mo. (Harry Richards, U. S. Atty., St. Louis, Mo., on the brief), for appellee.

Before SANBORN, WOODROUGH and VOGEL, Circuit Judges.

VOGEL, Circuit Judge.

William H. Anderson, Harry J. Hagen and Vincent J. Lee were jointly indicted and tried on a three-count indictment. By jury verdict Lee was found not guilty on all three counts; Anderson and Hagen were found not guilty on Counts I and II but guilty as to Count III; each was sentenced to five years' imprisonment.

Count I of the indictment charged the defendants with conspiring to obstruct, delay and affect commerce by extortion. Count II charged the obstruction of commerce by extortion in attempting to obtain money by threats of violence.

Count III, under which count Anderson and Hagen were convicted, charged that the defendants " * * * did wilfully, unlawfully and feloniously attempt to obstruct, delay and affect commerce

(as defined in the act hereinafter designated) and the movement of articles and commodities in commerce, to wit, building materials, supplies, machinery, equipment and employees, by extortion (as defined in the Act hereinafter designated), in that the defendants did attempt to obtain from Richard I. Johnson, an agent and representative of the said Richard I. Johnson Plastering Company, Inc., property of the said Richard I. Johnson Plastering Company, Inc., to wit, Twelve Thousand Five Hundred Dollars ($12,-500.00) of lawful monies of the United States of America, for their personal use and profit, by threatening physical violence to the person of the said Richard I. Johnson and upon the properties of the said Richard I. Johnson Plastering Company, Inc., and by using their aforesaid respective union capacities in a wrongful, arbitrary, unreasonable and oppressive manner to create industrial strife and unrest on the aforesaid 'hospital' construction project by refusing to permit union lathers and plasterers to be employed on said 'hospital' project, said union workmen being under the union jurisdiction of the said defendants, to begin their work duties, among other things, unless and until the said Richard I. Johnson Plastering Company, Inc., should pay to the defendants the aforesaid money; that the defendants, in the manner and by the means aforesaid, did attempt to obstruct, delay and affect the continuity of the construction of the aforesaid 'hospital' and the movement of articles and commodities in commerce, as aforesaid."

Evidence introduced at the trial indicated that in the year 1950 the Del E. Webb Construction Company held the general contract for the construction of a Veterans Administration Hospital at St. Louis, Missouri. On December 13, 1950, the Richard I. Johnson Plastering Company and Del E. Webb Construction Company executed a contract whereby the Johnson Plastering Company was to perform the lathing and plastering work on the hospital. During the latter part of November, 1950, Richard I. Johnson, president of the plastering company, and

his general manager, Russell Hanson, arrived in St. Louis to investigate conditions prior to executing the lathing and plastering contract. Johnson stayed at the Chase Hotel. He communicated with John Meroney, who was in charge of the St. Louis office of the Inland Steel Company. Meroney took Johnson to see Karl Kohlmeyer, who called the defendant William H. Anderson, whereby an arrangement was made for Johnson to meet Anderson at the home of the defendant Harry J. Hagen. Anderson was agent and representative of the local plasterers' union. Hagen was agent and representative of the lathers district council in the City of St. Louis. Pursuant to agreement, Johnson went to the Hagen home where he met Anderson and Hagen. The three of them went into the basement and sat down. Anderson asked Johnson what it would be worth for him to come to St. Louis and not have any union trouble. Johnson replied that it would be worth a couple of Cadillacs, to which Anderson responded that they were not interested in Cadillacs but were interested in money. He asked Johnson for $18,000. Johnson replied that it would be impossible to pay that amount and offered to pay $12,500 at $1,000 per month. Anderson said he couldn't give an answer as to that amount as there was another party who would have to give approval. Arrangements were made to meet the following morning at breakfast. Anderson told Johnson not to mention the conversation to anyone or he wouldn't live long enough to regret it. During the conversation in the basement of the Hagen home, Hagen was present but did not say anything.

Johnson and Anderson met the following morning at nine o'clock at the Chase Hotel, where they had breakfast. Anderson told Johnson he had talked to the third party and that it was okay to go ahead and he would let him know when and where and how the money was to be paid.

Johnson testified that he next met Anderson as a result of a telephone call in September, 1951, in front of the Holly-

wood Roosevelt Hotel in Los Angeles, California. Anderson had called Johnson, advising him that he wanted to see him. Johnson invited Anderson, his wife and a nephew, Leonard Boedeker and his wife out to dinner. Johnson had his wife and a Mr. and Mrs. Harry Kissel. During the early morning hours when Johnson and Anderson were alone, Anderson asked Johnson for $2,000. Johnson told him that he didn't carry that much money around with him but he would do the best he could. Anderson replied, "You better get it."

On February 20, 1951, Johnson subcontracted the lathing portion of the work to one Charles W. Fawcett. Percy McAllister, a St. Louis plasterer, became interested in doing the plastering work. In November, 1951, McAllister had a conversation with Anderson, telling Anderson that he was thinking of contacting Johnson about obtaining the plastering contract for the hospital. Anderson told him that before he did he had better take the matter up with him because there had been some commitments made.

Subsequently, in the latter part of January or the early part of February, 1952, Johnson was in St. Louis, at which time he received a call at his hotel to go to St. John's Hospital in St. Louis where Anderson was a patient, that Anderson wanted to talk to him. Johnson went to the hospital that evening but before doing so, because he was frightened, he asked the cab driver to wait for him and to come to the hospital room in approximately 15 minutes and advise him that he had an urgent call. When Johnson arrived at the hospital room, there were several people present who left the room. Mr. Johnson was alone with Mr. Anderson. Anderson then asked Johnson for some money, to which Johnson replied that he didn't have any. Again Anderson said that he had better get it. Anderson then told Johnson about a man in San Luis Obispo who, in turning on the starter of his automobile, had his car blow up and that unless Johnson got some money the same thing could happen to him. Johnson replied that Anderson

couldn't threaten him in his own home town. Immediately following this conversation, the cab driver came up and Johnson left with him.

On January 31, 1952, Johnson entered into a contract with McAllister to do the plastering work on the hospital. McAllister started the plastering work in June, 1952. He had a conversation with Anderson, at which time Anderson asked him if Johnson had contacted him and sent anything for him. McAllister replied that he didn't know what he was talking about and hadn't gotten anything from Johnson.

The next time they met Anderson asked McAllister to go with him to where his car was parked at Grand and Delmar in St. Louis. Anderson told McAllister that Hagen and defendant Lee, who was agent and representative of the Operating Plasterers Association, were there in his car and that McAllister should tell them the same thing he had told Anderson. McAllister went to the car and told Hagen and Lee that he didn't know what Anderson was talking about in wanting to know if something was sent to him by Johnson. Defendant Hagen told McAllister to say nothing about this conversation and not to say anything to Charley Fawcett. McAllister replied that he would not say anything to Fawcett. Lee told McAllister that if something was not sent in pretty soon he would hold McAllister for it. McAllister replied he didn't know what Lee was speaking about and if Johnson sent something to him he would contact Lee.

In September, 1952, Mr. Hanson was in St. Louis and having lunch with McAllister in a restaurant, at which time Anderson came to their table and told McAllister that he wanted to talk to him. They left the table and walked a short distance away, at which time Anderson asked McAllister if the party with him was Hanson from Johnson's office. Anderson then went over to the table where Hanson was seated and asked Hanson if Johnson was in St. Louis, to which Hanson replied, "No." He then asked Hanson for Johnson's home tele-

phone number. Hanson replied that he didn't know it. Thereupon Anderson took out his business card which he gave to Hanson, telling him to give the card to Johnson and tell him he wanted to talk to him.

Anderson and Hagen have appealed separately to this court. They were, however, jointly indicted, tried and convicted before the same jury. Their appeals will be considered in this single opinion, separate or individual reference being made to each defendant where that becomes necessary or expedient.

1. *Sufficiency of the indictment as to Count III.* Each defendant attacks Count III of the indictment under which each was found guilty, claiming the count insufficient, Anderson on the ground that "* * * there was needed an overt act or allegation of an overt act in Count III of the Indictment, which was not present and further, the government had all of the elements of Count III incorporated into Counts I and II * * *," Hagen arguing "* * * a count in an indictment which charges an attempt to obstruct, delay or affect commerce, or the movement of any article or commodity in commerce, in any way, by either extortion or attempted extortion, fails to state an offense punishable under the aforesaid statute. * * * there must be an actual obstruction, delay or affect (sic) on commerce, regardless of the degree," and "The crime or the offense is the extortion or the attempted extortion, and the extortion or attempted extortion must obstruct, delay or affect interstate commerce."

We think the language of the third count of the indictment, which we have quoted in full, supra, is supported by the language of the statute, 18 U.S.C.A. § 1951, which, insofar as it may be pertinent herein, provides:

"§ *1951. Interference with commerce by threats or violence*

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion *or attempts or conspires so to do,* or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be * * *." (Emphasis supplied.)

In response to a demand, the government furnished a bill of particulars. Therein the government admitted in item No. 4, "Richard I. Johnson Plastering Company, Inc., did not commence work under said contract." And item No. 13, "No express threats of violence to property were made by any of the defendants." The indictment, however, does allege the performance of acts by the defendants toward consummation of the crime. It alleges that the defendants attempted extortion from on or about December 2, 1950, to the date of the indictment by threatening violence to the person and properties of Johnson and by using their offices to create industrial strife on the project and by refusing to permit laborers to work on the job. The bill of particulars and supplemental bills of particulars detail the specific threats and demands made by the defendants. We think Count III of the indictment amply withstands the attack against it. As Judge John Sanborn, speaking for this court, in Hewitt v. United States, 8 Cir., 1940, 110 F.2d 1, 5, said:

"'The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, "and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." Cochran and Sayre v. United States, 157 U.S. 286, 290, 15 S.Ct. 628, 630, 39 L.Ed. 704; Rosen v. United States, 161 U.S. 29, 34, 16 S.Ct. 434, 480, 40 L.Ed. 606 * * *.'

\* \* \* \* \* \*

"The sufficiency of an indictment should be judged by practical, and not by technical, considerations. It is nothing but the formal charge upon which an accused is brought to trial. An indictment which fairly informs the accused of the charge which he is required to meet and which is sufficiently specific to avoid the danger of his again being prosecuted for the same offense should be held good."

As to Hagen's charge that Count III of the indictment is insufficient because of failure to allege that interstate commerce was actually obstructed, etc., we must disagree. This court, dealing with the same statute (18 U.S.C.A. § 1951) in Hulahan v. United States, 8 Cir., 1954, 214 F.2d 441, 445, said:

"We have no doubt that Congress has the power to deal with extortion or *attempted extortion actually or potentially affecting interstate commerce*, just as it has power to deal with unfair labor practices so affecting interstate commerce. Nick v. United States, supra, 8 Cir., at page 668 of 122 F.2d. See and compare, National Labor Relations Board v. Fainblatt, 306 U.S. 601, 604–606, 59 S.Ct. 668, 83 L.Ed. 1014; National Labor Relations Board v. Denver Building & Construction Trades Council, 341 U.S. 675, 683–684, 71 S.Ct. 943, 95 L.Ed. 1284; National Labor Relations Board v. Crowe Coal Co., 8 Cir., 104 F.2d 633, 638–639, certiorari denied 308 U.S. 584, 60 S.Ct. 107, 84 L.Ed. 489. Compare, also, United States v. Employing Plasterers' Association of Chicago, 347 U.S. 186, 74 S.Ct. 452, [98 L.Ed. 618]. (Emphasis supplied.)

"It seems apparent from the language of the statute that it was the intent of Congress to protect interstate commerce against extortion or attempted extortion which in any way or in any degree reasonably could be regarded as affecting such commerce. The exaction of tribute from contractors engaged in local construction work who are dependent upon interstate commerce for materials, equipment and supplies, or who are engaged in constructing facilities to serve such commerce, is, in our opinion, proscribed by the statute in suit."

In addition thereto, the evidence disclosed that while the Johnson Plastering Company did not actually commence work on the contract itself, it did send materials and equipment through interstate commerce in connection with this particular job. Interstate commerce having been established, jurisdictional requirements were satisfied and there can be no doubt but what the testimony was sufficient to justify the conclusion that the defendants' actions affected interstate commerce through their attempted extortion. We hold Count III of the indictment as being sufficient.

■ 2. *Inconsistency of jury's verdicts.* Each of the defendants argues that the guilty verdict on Count III is inconsistent with the acquittal verdicts as to Counts I and II. In Downing v. United States, 8 Cir., 1946, 157 F.2d 738, 739, this court said:

"Prior to Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356, 80 A.L.R. 161, there had been a conflict in the federal courts on whether an inconsistent verdict on the seperate counts of an indictment could support a criminal sentence. The Dunn case settled the .question, however, when the Supreme Court refused to reverse a conviction for inconsistency in verdict on the separate counts of an indictment, involving the same evidence, and said, 284 U.S. at page 393, 52 S.Ct. at page 190: 'Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment. * * * If separate indictments had been presented against the defendant for possession (of intoxicating liquor) and for maintenance of a nuisance, and had been separately tried, the

same evidence being offered in support of each, an acquittal on one could not be pleaded as res judicata of the other. Where the offenses are separately charged in the counts of a single indictment the same rule must hold.' "

Acknowledging the Dunn case as controlling here, we, nevertheless, find no inconsistency between a jury's verdict of not guilty of conspiracy or of obstructing commerce but guilty of attempting to obstruct commerce, even though the basis for each charge springs out of the attempted extortion of $12,500 from Johnson and the threats of physical violence against him and his company's properties.

■ 3. *Sufficiency of the evidence to sustain the conviction of Hagen.* Hagen contends that the evidence was wholly insufficient to sustain the verdict against him and that the verdict of the jury acquitting him on Counts I and II warranted his acquittal on Count III.

A reiteration of the evidence *in toto* would appear unnecessary. The original demand for money was in the basement of Hagen's home with Hagen present. While he said nothing, the jurors were entitled to conclude that he acquiesced therein and that he and Anderson were acting in concert in attempting to extort money from Johnson. Hagen was also present when McAllister was told that if Johnson didn't send the money soon McAllister would be held for it. We think the jurors were entitled to draw the inference that in the attempted extortion Hagen was acting with Anderson.

■ 4. *Defendants' demands for government to produce statements and reports of witnesses.* Both defendants contend that the court erred in its ruling on their motions for the government to produce for inspection statements, records and reports of government witnesses recorded by and in the possession of the United States. Defendants' demands concern the three government witnesses Johnson, Hanson and McAllister. As to Johnson, the government gave the defendants two statements or reports, one by the F.B.I. on February 23, 1953, and one by an Assistant United States Attorney, Boecker, on February 2, 1956. The one given to Boecker was signed by the witness. The one from the F.B.I. files was a substantially verbatim report of an oral interview subsequently approved by Johnson.

As to the witness Hanson, the government gave to the defendants a report dictated by Mr. Boecker on February 2, 1956, covering a joint interview with Johnson and Hanson which was subsequently approved by both witnesses. While defendants contended otherwise, the witness testified that there was no other written statement or transcript of a statement of his.

As to the witness McAllister, the government gave the defendants a statement taken by Mr. Boecker on April 30, 1956, and approved by the witness. Defendants contended that a prior statement had been taken by F.B.I. Agent Heineke in 1953. The government denied possession of any such statement and the witness testified, "In 1953, I was interviewed by Otto Heineke of the FBI. I do not recall if he made notes of our conversation. Our conversation lasted for approximately twenty minutes and it was about the facts in connection with this case."

During the trial, and as a result of the defendants' demands and insistence that there were other reports and statements to which they were entitled, the trial judge twice examined the F.B.I. files and determined, "I have gone through them and I found nothing more than has been given in that case already. I have gone all through it over the week end and read the entire FBI file, but I find nothing more that I think you are entitled to and you have already been given." The record indicates that the defendants continued to dispute the government's contention that it possessed no reports or statements of government witnesses other than those already produced.

In Jencks v. United States, 1957, 353 U.S. 657, 668, 77 S.Ct. 1007, 1013, 1 L.Ed. 2d 1103, relied upon by the defendants,

the Supreme Court held that the petitioner there " * * * was entitled to an order directing the Government to produce for inspection all reports of [government witnesses] in its possession, written and, when orally made, as recorded by the F.B.I., touching the events and activities as to which they testified at the trial", and, further, that he was entitled to inspect the reports to decide whether to use them in his defense. This does not mean that the defendants were entitled to sift the government files from top to bottom in the hope that they might turn up something of value to them. The government contended that it had no reports or statements made by its witnesses other than those which had already been produced and while the testimony is unsatisfactory and possibly conflicting, we do not consider that it established the existence and possession of any other reports and statements to which the defendants might be entitled under the Jencks rule. In addition thereto, the trial judge made careful search and found nothing.

Nevertheless, if our interpretation of the Jencks opinion is incorrect and the defendants were thereunder entitled to various summaries and other reports, the case merely presents error without prejudice. The trial court gave the defendants the rights they were entitled to under § 3500 of 18 U.S.C.A., albeit prematurely. A new trial on this ground could avail the defendants nothing. The Court of Appeals for the 2nd Circuit was presented with a similar situation in United States v. Lev, 2 Cir., 1958, 258 F.2d 9, 13, wherein they concluded:

"While defendants may perhaps have been given a right to inspect a statement of this nature [investigator's summary of an interview with a witness written subsequently and not a substantially verbatim record] by the Jencks decision, supra, 353 U.S. 657, 668, 77 S.Ct. 1007, 1013, 1 L.Ed.2d 1103, the recent codification of discovery in this situation allows a defendant to examine only the following:

" '(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

" '(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement.' 18 U.S.C. § 3500(e) (1) (2).

"As this statute will apply on a new trial of any of these defendants, and as under it discovery of the summary cannot be required, the trial court's error is rendered harmless. United States v. Miller, 2 Cir., 248 F.2d 163, certiorari denied Miller v. United States, 355 U.S. 905, 78 S.Ct. 332, 2 L.Ed.2d 261."

See also United States v. Angelet, 2 Cir., 1958, 255 F.2d 383, 385.

■ 5. *Testimony of witness McAllister.* The defendants claim that the trial court erred in overruling their motion to preclude plaintiff's witness McAllister from testifying. McAllister was a St. Louis plastering contractor who sublet the plastering work herein, beginning such work in June, 1952. In 1953 McAllister testified before the grand jury. In January, 1956, he moved permanently to Florida. Before doing so, he burned his business records after they had been checked by the Internal Revenue Department. In April, 1957, at the request of the defendants, a *subpoena duces tecum* was issued for the appearance of McAllister in St. Louis with certain of his records. McAllister appeared but his records were not available as they had been destroyed in 1956. In overruling the defendants' motion and allowing McAllister to testify, the trial court pointed out that there was nothing to indicate that McAllister's records could be relevant to this case. McAllister's testimony consisted of relating conversations he had had with the defendants concerning demands made by them of Johnson. There was no error in the court's ruling.

**6.** *Variance between bill of particulars and testimony.* Defendant Hagen contends that error was committed in allowing a variance between the bill of particulars and the testimony. The bill of particulars stated that Johnson did not commence work pursuant to his contract with Del E. Webb Company for the lathing and plastering. It is true that Johnson, due to his subletting to McAllister and Fawcett, actually did none of the lathing and plastering. However, prior to subletting he sent certain equipment and material through interstate commerce to the job site. The Webb Company installed some of this equipment and billed Johnson. The variance was inconsequential and no error was committed.

**7.** *Remarks of government counsel during trial.* It is contended by both defendants that a mistrial should have been granted because of improper remarks of government counsel and of one of government's witnesses. We have examined the statements, find them not to be of major consequence and no error in the rulings of the court.

**8.** *Newspaper articles.* It is further contended that a mistrial should have been granted because of the publication of certain newspaper articles during the course of the trial. At the beginning of the trial the jurors were cautioned not to read newspaper articles about the case. Subsequent inquiry by the court failed to reveal that any juror had violated such instructions. The court did not abuse its discretion in denying the motions. See Smith v. United States, 8 Cir., 1956, 236 F.2d 260, 269–270.

**9.** *Jury instructions.* Each of the defendants charges error in the court's instructions to the jury. We have examined the instructions in detail and find that considered as a whole they fully and fairly apprised the jury of the law applicable to this case and that no prejudicial errors were committed.

**10.** *Coercing of jury.* Both defendants contend that the court erred by inquiring as to the division of the jury and in giving an additional charge during its deliberations. After receiving the court's charge, the jury retired in the afternoon of July 12th. At 9:40 o'clock that evening the trial judge recalled them and, after ascertaining that they were not in agreement, stated to the foreman:

> "Don't tell me how they stand or how they are divided. I might ask you this much, I want no numbers, don't tell me how much on one side or the other, but are they at all evenly divided, or is it very much one way or very much the other?"

To which the foreman replied:

> "It is pretty evenly divided, Your Honor."

The court thereupon instructed the jury further, using some of the language approved by the Supreme Court in Allen v. United States, 1896, 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528.

In support of their contention that the inquiry and subsequent charge coerced the jury into reaching an irreconcilable compromise verdict, defendants cite Burton v. United States, 1905, 196 U.S. 283, 305–308, 25 S.Ct. 243, 49 L.Ed. 482; Brasfield v. United States, 1926, 272 U.S. 448, 450, 47 S.Ct. 135, 71 L.Ed. 345; Jordan v. United States, 9 Cir., 1927, 22 F.2d 966, 967; Stewart v. United States, 8 Cir., 1924, 300 F. 769, 782–783; Nigro v. United States, 8 Cir., 1925, 4 F.2d 781, 783; and United States v. Samuel Dunkel & Co., 2 Cir., 1949, 173 F.2d 506, 507.

The government concedes that the inquiry made by the trial court in the instant case was "ill advised" but it contends that it was not prejudicial and, under the circumstances, not coercive of the jury.

The teaching of most of the cases relied upon by the defendants is that where the inquiry from the court elicits the information that the jury is unevenly divided, the giving of the extracts from the opinion in Allen v. United States, supra, is probably coercive of the minority and, hence, prejudicial error. That is not the

situation here. The trial judge was told that the jurors were "pretty evenly divided". From a purely practical standpoint, then, we do not see how the giving of a supplemental charge from the Allen case could possibly have been coercive. Here there was no minority to coerce and the trial judge was meticulous in avoiding any reference to a minority. Cf. Cook v. United States, 5 Cir., 1958, 254 F.2d 871, where the error of inquiring of the jury as to how they stood numerically was aggravated by the suggestion that the jury might be confined through a four-day period while the judge was away. This was held to be reversible error. On the same date the same three judges from the 5th Circuit, in Butler v. United States, 5 Cir., 1958, 254 F.2d 875, held that while the inquiry as to how the jury stood numerically constituted error, it had no coercive effect upon the jury because the reply was, "We are trying each count. Sometimes we get pretty close and then again we are not". While constituting error, the substantial rights of the appellant were not affected and the conviction was affirmed.

In Bowen v. United States, 8 Cir., 1946, 153 F.2d 747, certiorari denied 328 U.S. 835, 66 S.Ct. 980, 90 L.Ed. 1611, this court had before it a situation where the foreman of the jury, by unsolicited note, informed the court that it was deadlocked 11 to 1 and the trial court thereupon gave a supplemental instruction urging the jurors to agree if they could conscientiously do so. The defendant there based his claim of error upon the Burton and Brasfield cases. This court stated, at page 752 of 153 F.2d:

"In the Brasfield case, the Supreme Court ruled that it is reversible error for a judge to inquire of a jury, unable to agree, the extent of its division numerically. This, upon the theory that the general tendency of such an inquiry is coercive and that 'such a practice, which is never useful and is generally harmful, is not to be sanctioned.' Page 450 of 272 U.S., page 136 of 47 S.Ct., 71 L.Ed. 345. All that the Supreme Court has thus far held is that it is improper for a trial judge to inquire of a jury, which has failed to agree, how they are divided numerically, and that if a judge makes the inquiry he commits reversible error. * * *

* * * * * *

" * * * We fail to see why the unsolicited information furnished to the court by the foreman of the jury should cause a mistrial or should preclude the court from giving a proper supplemental instruction to the jury."

Cf. St. Louis & S. F. R. Co. v. Bishard, 8 Cir., 1906, 147 F. 496, 499–502; Stewart v. United States, supra, 300 F. at pages 782–787; Lucas v. United States, 8 Cir., 1921, 275 F. 405, 407–408; Shaffman v. United States, 3 Cir., 1923, 289 F. 370, 374–375.

Our conclusion here is that the two defendants who were convicted on the third count of the indictment received a fair trial, that there was no coercion in giving to the "pretty evenly divided" jury the guarded instruction used here. No substantial rights of the appellants were affected.

We have considered all points raised by the defendants and find no error.

Affirmed.