MAY WOODS v. INCORPORATED TOWN OF LISBON, Appellant.

**Physician and patient:** PRIVILEGED COMMUNICATIONS: WAIVER. The
1 statute relating to confidential communications does not disqualify a physician from testifying to professional communications, but ·is for the protection of the patient; and the patient may waive this privilege either by examining the physician or other witnesses as to such matters, or testifying with relation thereto himself.
In this action for personal injury the plaintiff by her own testimony and that of others waived her right to object to an examination of her physician by defendant concerning the same matters.

**Same.** Where two or more physicians are engaged in the same opera-
2 . tion a waiver as to one of the physicians of the prohibition of the statute as to privileged communications will render them all competent witnesses.

Vol. 150 Ia.—28.

**Evidence:** CROSS-EXAMINATION.   Where a physician was held to be
3   a competent witness on a prior appeal, the cross-examination of
such witness on a retrial, for the purpose of discrediting him
as a witness in advance of his direct examination, should not be
permitted.

**Expert evidence:** WEIGHT: INSTRUCTIONS.   An instruction as to the
4   weight to be given the opinion of an expert based on an assumed
state of facts, the jury should also be told that in the first in-
stance the weight must be based on the truthfulness of the facts
assumed.   And the jury should also be instructed as to the dis-
tinction to be made between such opinions based on facts wnolly
assumed and those based upon personal knowledge and obser-
vation.

*Appeal from Linn District Court.*—HON. F. O. ELLISON,
Judge.

WEDNESDAY, MARCH 15, 1911.

SUIT to recover damages for a personal injury.   Ver-
dict and judgment for plaintiff.   The defendant appeals.
—*Reversed.*

*Randall, Courtney . & Harding* and *Jamison, Smyth
& Hann,* for appellant.

*E. A. Johnson* and *Chas. W. Kepler & Son,* for ap-
pellee.

SHERWIN, C. J.—This is the second appeal in this
case.   The opinion on the first appeal is reported in 138
Iowa, 402, where a sufficient statement of the issues will
be found.   One of the questions before us on this appeal
is whether the court rightly held that Drs. York and
Crawford were incompetent witnesses for the defendant
under the record here presented.   Dr. York was the plain-
tiff's attending physician from the time of her injury un-
til after the operation on her at the hospital, and Dr.

Crawford was one of her physicians at the hospital operation. These two physicians were so related to the plaintiff in a professional way as to make them incompetent witnesses under the statute unless she waived the secrecy imposed thereby. The statute (Code, section 4608), so far as material here, is as follows: "No practicing physician . . . (or) surgeon, . . . who obtains such information by reason of his employment, . . . shall be allowed in giving testimony, to disclose any confidential communication properly intrusted to him in his professional capacity, and necessary and proper to enable him to discharge the functions of his office according to the usual course of practice. . . . Such prohibition shall not apply to cases where the party in whose favor the same is made waives the rights conferred." The question here is whether the plaintiff waived the prohibition of the statute.

The statute does not absolutely disqualify the physician from testifying, but it places it within the power of the patient to secure medical aid without the betrayal of his confidence. The patient may, therefore, waive objection, as the statute expressly provides, and permit the physician to testify. The waiver may be made in several ways: It may be done by calling the physician to testify as to privileged matters or by calling other witnesses to testify to the same facts. Manifestly, if the patient himself breaks the seal of secrecy and gives publicity to the whole matter, there is a waiver, and this is true whether publicity is given by the testimony of the physician, by the testimony of the patient himself, or by the testimony of his other witnesses. In other words, when the patient voluntarily publishes the occurrences of the sick room, he can not be permitted to insist that the prohibition and privilege of the statute continues to exist as to his physician. If by his voluntary act he lifts the veil, the profes-

1. PHYSICIAN AND PATIENT: privileged communications: waiver.

sional duty of secrecy ceases, and the physician is a competent witness under the statute.   It would be a reproach to the administration of justice, even in the absence of the statute, if the patient himself might detail all that occurred with his physician and yet compel the physician to remain silent.   23 Am. & Eng. Enc. of Law (2d Ed.) 91; 10 Current Law, 2092; *Marquardt v. Brooklyn R. Co.,* 126 App. Div. 272 (110 N. Y. Supp. 657); *Marx v. Manhattan Ry. Co.,* 56 Hun (N. Y.) 576 (10 N. Y. Supp. 159); *Morris v. New York Ry. Co.,* 148 N. Y. 88 (42 N. E. 410, 51 Am. St. Rep., 675); *Lane v. Boicourt,* 128 Ind. 420 (27 N. E. 1111, 25 Am. St. Rep. 442); *State v. Bennett,* 137 Iowa, 427; *Lauer v. Banning,* 140 Iowa, 319; *Burgess v. Sims Drug Co.,* 114 Iowa, 275; *People v. Gallagher,* 75 Mich. 512 (42 N. W. 1063); *Hunt v. Blackburn,* 128 U. S. 464 (9 Sup. Ct. 125, 32 L. Ed. 488); *Denning v. Butcher,* 91 Iowa, 425; *Kelly v. Cummens,* 143 Iowa, 148.

That the plaintiff waived the secrecy imposed by the statute as to what Dr. York did before she went to the hospital will clearly appear from her direct testimony in her own behalf, a part of which is as follows:

A. I suffered intense pain across my abdomen while going from the chicken house to my home.   Q. I wish you would describe to me the nature and character as to whether or not it was a bearing down.   A. It was a bearing down pain all of the time right across here, so severe I could hardly stand it going over home.   This was right across my abdomen there over the womb.   The doctor and my mother-in-law and my husband came to my house. The doctor did not do anything, only inject medicine in my arm and examine me.   He examined me with a speculum, inserting it into my vagina.   He remained about fifteen or twenty minutes.   He spent about fifteen minutes examining me. . . .   The doctor came back to see me the next morning.   The pain continued all night as it had during the afternoon and evening, and it made me

sick all over. The accident occurred on Wednesday. The doctor came back Thursday morning and injected some medicine in my arm and left some for me to take internally. He was there again Thursday evening. On Friday my pains were different. They were bearing down pains and cramps getting down near the lower part of the abdomen. They were more bearing down, more labor pains. I am the mother of a child. These pains were of the nature of labor pains. They were bearing down pains across the lower part of the abdomen and the womb. I commenced to flow on Friday. The doctor was there Friday and Saturday. On Sunday he performed an operation at my house. The only change in the pains from Friday to Sunday was that they became more severe. Dr. York performed an operation on me in the afternoon of Sunday. He came in the afternoon about 3 o'clock, and it was about 5:30 when he went home. My mother-in-law, Mrs. Kohl, my husband, and Mrs. Stanton were present when this operation was performed. Q. Tell in your own way, Mrs. Woods, just what all the doctor did, describe the instruments he used as near as you can, and the manner in which he used them. A. When he first came, he gave me some whisky to take. Laid me across the bed and worked with the instruments—speculum in the vagina. Used instruments about nine or ten inches long. Q. How many instruments did he use? A. Three or four different kinds he used. Q. Did he insert them into your vagina? A. Yes, sir. Q. How long was he working with you till he removed something from your person? A. About an hour and a half. Q. Were you lying on the bed? A. Yes. Q. State to the jury just how the bed was situated with reference to being away from the wall. A. Yes, pulled out from the wall so they could work around the bed. Q. Before he commenced the operation, was there any rubber attachment placed under you? A. Yes, sir. Q. How did you lie, lengthwise or crosswise? A. Crosswise of the bed. Q. Was it just a common ordinary bed? A. Yes, sir. Q. During this operation, what did Mrs. Stanton—what did she do, and where did she sit or stand? A. She stood at my head and fanned me. Q. All the time the doctor was digging around there, an hour and a half? A. Yes,

sir.  Q. Who was on the other side of the bed where your feet were.  A. Mrs. Kohl and my husband.  Q. What was Mrs. Kohl and your husband doing?  A. Mrs. Kohl was holding one foot up on the bed, and Mr. Woods was holding the other.  Q. Mr. Woods was holding one foot up on the bed on one side and Mrs. Kohl on the other?  A. Yes, sir.  Q. The doctor was in between them, wasn't he?  A. Yes, sir.  Q. You say the doctor was working with instruments about one and one-half hours?  A. Yes, sir.  Q. After he got through, did you have relief, did these pains cease?  A. Yes, sir.  The labor pains I had suffered ceased shortly after the doctor got through with the operation.  The rubber that they put under me extended down over the side of the bed and dropped down nearly to the floor.  Q. When it came over the bed and dropped down, where it formed a kind of trough to carry the matter that came from you?  A. Yes.  The bed was just an ordinary bed about three feet high.

Plaintiff also went into the details of her treatment by Dr. York at the house with other witnesses.  Counsel seek to avoid the effect of the ruling excluding Dr. York's testimony as to his treatment of the plaintiff at her home by the claim that the questions asked him did not relate to any matter testified to by the plaintiff.  Dr. York was asked if he removed a fœtus from the plaintiff at the time, and if he performed such an operation as the plaintiff described and removed a fœtus from her.  In both instances objection was made that the doctor was an incompetent witness under the statute.  The plaintiff pleaded that her fall produced a miscarriage, and all of her testimony as to the character and extent of her injury tended in the same direction.  Her testimony as to the nature of the operation performed by Dr. York and its results was intended to make the jury believe that a fœtus was taken from her at that time, nor did she make any claim in her testimony that she was relieved of it at any other time or place.  Dr. York was a competent witness, and the error in rejecting his testimony was highly prejudicial, for the nature and

extent of the plaintiff's injury was of great importance to the defendant.

Perhaps a more doubtful question is presented by the rejection of both Drs. York and Crawford as witnesses relative to the operation in the hospital. The plaintiff herself testified on the subject as follows:

On Wednesday following the Sunday I claim I had a miscarriage, a large lump in my side made its appearance. It was on the right side right across the right ovary. The lump grew in size. On the second Sunday following the accident, I was taken to St. Luke's Hospital. The lump was then as large as my two fists. There was swelling and soreness across the abdomen. There was a hard lump. I had never had any enlargement on the side before, nor in any portion of my body. My husband went with me to the hospital and no one else. I was placed in a ward. I was very sick and suffered pain in the abdomen and had fever. This lump spread across the abdomen. It appeared straight down from the navel right across the right ovary. There was pain in the region about my womb —kind of moderate pain. The more intense pain was across where the lump was. In the hospital they took hot water bags and put ice in them and laid them on my abdomen and across the ovary and examined me. They kept ice there for three and one-half days and then operated on me. After they took off this ice, they inserted a rubber tube in my vagina to draw off the pus. The tube was about eight or nine inches long, and was left there about ten days. It reduced the size of this lump somewhat, but not fully. After that it drained off itself. Afterward on the 12th day of February, 1906, they performed an operation on me. Before the operation was performed, I was placed under anæsthetics. They put me under the influence of anæsthetics in some other room than the operating room. After the operation was over, I learned that they made an incision from the navel to the bone. The Drs. Crawford were there, but not in the room, when they gave me the anæsthetic.

Her husband went to the hospital with her, and he testified on direct, as her witness, as follows:

She went to the hospital on the 3d of December, and I think the first operation was the 7th. At this first operation they first put her under the influence of an anæsthetic, then put a speculum into the vagina, then they put a rubber tube about eight or ten inches long into the vagina up into her parts. I don't think any portion of it remained visible. It was about all they did. Before this they put ice in a box and laid beside her. She was packed in ice before they inserted this rubber tube. I believe she was again operated upon by an incision in her belly the 12th day of February. I was not present at that operation. I saw her just before she went into the operating room and as soon as she was brought out, the day of the second operation. Q. When did you first learn or hear or first see and learn in that way that your wife had been operated on by the incision being made in her belly? A. I don't think that I saw it until she come home. She came home the 10th of March. She had a scar commencing just below the navel and going right straight down to the bone. There was a little bit at the bottom that wasn't quite healed up.

The plaintiff and her husband testified as to what was done when she was first taken to the hospital and thus opened the door for the testimony of her physicians on the same subject. She also testified as to 2 Same. the extent and location of the operation on the 12th of February, 1906, and the physicians were certainly competent witnesses as to the character and extent of that operation. Where two or more physicians are engaged in the same operation, a waiver of the prohibition of the statute by making public the otherwise privileged matter makes them all competent witnesses. See cases *supra*. In *Baxter v. City of Cedar Rapids*, 103 Iowa, 599, it appears that there had been no waiver as to the physician who was held incompetent. Hence the case is not in point here.

Fifty-two errors are assigned, and most of them are argued to some extent at least. It is manifest that we

can not separately discuss all of them, nor is it necessary to do so. The majority of them relate to matters of little importance which could not have prejudiced the defendant's case. Two or three other matters do require attention, however.

On the former appeal, we held that Dr. H. W. Bender was a competent witness as to the operation at the hospital, yet on the present trial the plaintiff, under

3. EVIDENCE: cross-examination.

the shallow pretense of an examination as to his competency, was permitted to cross-examine and discredit the witness in advance of his direct examination. It was a flagrant violation of the most elementary rules of practice and should not have been permitted.

The court instructed as to the weight to be given to the opinion of experts based on an assumed state of facts, but nowhere told the jury that such weight must in the

4 EXPERT EVIDENCE: weight: instructions.

first place be based upon the truthfulness of the facts assumed. Such a direction should have been given. Moreover, the instructions made no distinction between opinions based on facts wholly assumed and those based on personal knowledge and observation. This distinction should also have been made.

One of the counsel for the plaintiff is charged with serious misconduct in argument to the jury; but, as no exception seems to have been saved, we can not consider the matter.

There was evidence tending to show actual notice to the town of the defective condition of the walk and sufficient evidence to take the case to the jury. The court was therefore right in not directing a verdict for the defendant.

Other errors discussed by counsel need not be further considered.

For the errors pointed out, the judgment must be,

and it is, reversed. Plaintiff's motion to strike parts of appellant's abstract is sustained.—*Reversed.*

WEAVER, J.—I concur in the conclusion that the judgment below should be reversed; but I do not wish to be bound by the discussion of appellee's alleged waiver of her right to object to the disclosure by her physicians of information obtained in professional confidence.