## STATE EX REL. MELVIN SCHULER v. RALPH H. TAHASH.

154 N. W. (2d) 200.

November 10, 1967—No. 40,545.

*C. Paul Jones,* State Public Defender, and *Ronald L. Haskvitz,* Assistant State Public Defender, for appellant.

*Douglas M. Head,* Attorney General, *Gerard W. Snell,* Acting Solicitor General, and *David C. Weinberg,* Special Assistant Attorney General, for respondent, warden of State Prison.

PETERSON, JUSTICE.

Relator, Melvin Schuler, shot and killed his father on March 11, 1940. He was indicted for murder in the first degree by the grand jury of Wright County on May 6, 1940. He pleaded not guilty to the indictment for

murder in the first degree, but pleaded guilty to murder in the second degree. He was thereupon sentenced to life imprisonment in the State Penitentiary, where he is still confined.[1]

Relator petitioned for a writ of habeas corpus on May 5, 1966,—26 years after his conviction—on the ground that his plea of guilty was improvidently made and accepted. His plea of guilty, relator argues first, was induced—upon advice of counsel—by the existence of a constitutionally inadmissible confession, which his counsel in effect erroneously advised him would be admissible against him in a trial. The court, he argues second, improperly accepted his plea of guilty when his counsel, in the presentence proceedings immediately following acceptance of his plea, made statements inconsistent with his plea of guilty. After an evidentiary hearing on July 28, 1966,[2] the habeas court discharged the writ and denied relator's petition for discharge.

The basic issue, on relator's appeal from the order of the habeas court, is whether the court's findings of fact are supported by the evidence. The court found as matters of fact, first, that relator's confession was neither involuntary nor the actual inducement for his plea of guilty; and, second, that his plea was made upon advice of competent counsel and that his counsel's presentence comments were not inconsistent with the plea.

The homicide was the result of a violent quarrel over the decedent's use of relator's shotgun. Relator and the decedent were both persons of bad temper and had quarreled violently on repeated occasions. In

---

[1] Relator has never been admitted to parole. We are advised that he has presented no disciplinary problems as a prisoner and that denial of parole has been due mainly to inability to structure parole suitable for his present personal situation.

[2] The record of the original proceedings in this old case is somewhat sketchy, and most of the evidence, both real and testimonial, is no longer available. The habeas court had before it a transcript of a "preliminary hearing" before a justice of the peace, held on March 18, 1940, at relator's request, for the purpose of determining probable cause to hold him under arrest until the next general term of the district court; and the court had a transcript of the proceedings before sentencing. The lawyer who represented relator at that time was not called as a witness by either relator or the state in the habeas corpus proceeding, so the only testimony was that of relator himself.

the course of a struggle for possession of relator's shotgun, decedent was felled by two shotgun blasts. Relator does not deny that his second shot was intentional. He claims only that his first shot was accidental and that the wound thereby inflicted was mortal. He argues, from this latter assumption of fact, that the element of intentional causing of death, essential to a conviction for murder in the second degree, was absent.

Relator was arrested at about 10 p. m. on the night of the shooting and was visited in jail by the county sheriff at about 7:30 a. m. the next day. What accused stated at that time is disclosed in the testimony of the sheriff at the preliminary hearing:

"Q.   [By County Attorney Walter S. Johnson] What did you say when you went in to see him?

"A.   He said hello, Paul and I said Hello, Melvin.

"Q.   Then what was said?

"A.   We took hold of hands and I asked him what was the trouble. * * * Melvin was crying a little bit.

"Q.   What did you say to him?

"A.   I asked him what was the trouble down there, and he started to cry again. I told him that if he wanted to tell me about it, it was all right, but that anything he said could be used against him in a trial if there was a trial. I told him that the best way was the easiest way. He cried some more. I asked him what was the trouble down there. He said he shot his father. I asked him how it happened and he said that he left the house about 11:30 or 12 o'clock to call his dad for dinner. His father had the shot gun. The hammer was open. He said to his dad, that gun is open, you better close it. His dad said a harsh word and he didn't know what it was.

"Q.   Melvin didn't say what the harsh word was?

"A.   No.

"Q.   Then what did he say had happened?

"A.   Melvin said he grabbed the gun from his father and he pulled the trigger and he shot his father in the face. While he was going down, he pumped it once more and he shot his father again.

"Q.   Did he say his father was down when he shot him the second time?

"A.   He said that he was down, just going down.

"Q.   Then what happened?

"A.   Then he called his mother and told her that dad had shot himself. They called Dr. Phillips and Dr. Roholt. I said, Melvin, that's fine. I can't promise you anything because anything you say can be used against you. I will get a stenographer and we'll take down what you have said and have you sign it and which happened."

Relator's claim that his "confession" was involuntary is based on the fact that his counsel was denied permission to see him during the morning the confession was taken. Relator's mother had by that time retained private counsel for her son.[3] It is uncertain, however, whether the request for counsel was made during the course of oral interrogation or in the interim between the conclusion of the interrogation and the transcription of the stenographer's notes. The testimony of the sheriff at the preliminary hearing seems to indicate that the denial of access more probably occurred after the interrogation:

"Q.   [Cross-examination by Mr. Welch] He asked to see me around 8 o'clock?

"A.   No he did not.

"Q.   When he wanted to see me, what did you tell him?

"A.   I said he could see you when we had taken his statement.

"Q.   You told me that I couldn't see him until after the statement was written up?

"A.   Yes.

"Q.   As a matter of fact it was around 9 o'clock when he wanted to see me?

"A.   Maybe it was.

"Q.   You told me he wanted to see me and that I couldn't see him until you had taken the statement?

"A.   Yes.

*     *     *     *     *

"Q.   What time did you commence talking to him?

---

[3] Counsel was Thomas Welch, an able and experienced attorney in Buffalo, Minnesota. Welch had formerly been county attorney for about 14 years and was at that time a senator in the Minnesota Legislature.

"A.   About 7:30.

"Q.   What time did you get through talking to him?

"A.   It was a good half hour or more." [4]

Relator's claim that his plea of guilty was induced, on advice of counsel, upon genuine misapprehension that an inadmissible confession would otherwise be used against him at trial is based upon relator's sole testimony in the habeas court:

"Q.   [By Ronald Haskvitz, assistant state public defender] * * * Did this confession play any part in your decision to plead guilty?

"A.   No, it didn't. * * * I followed the advice of my attorney.

"Q.   What was your attorney's advice?

"A.   He felt that if I stood trial I would be convicted of first degree and I would never have an opportunity to ever be released.

*   *   *   *   *

"Q.   Did he tell you why, did he tell you why you would be found guilty?

"A.   Because he said he didn't think that he could stop the confession from being—my statement—the confession from being stricken from the record.

*   *   *   *   *

"Q.   Did this have any bearing on your decision to plead guilty?

"A.   (No response)

"Q.   Well, his advice was to plead guilty?

"A.   Yes.

"Q.   Is this what you meant, your attorney advised you to plead guilty to second degree because of the confession?

"A.   Yes, that was his excuse."

Relator made no effort to call Welch as a witness to corroborate this tes-

---

[4] Relator testified in the habeas court that the questioning took "from four to at least eight hours," but he also testified that he signed the confession "[s]ometime towards noon." That the interrogation lasted that long is inherently doubtful, moreover, both from the nature of the statement received and from the undisputed fact that relator was again questioned by agents of the State Crime Bureau that same afternoon. The sheriff, according to the habeas record, is now deceased.

timony, although it is known that Welch is very much alive and would have been available to appear, either voluntarily or by subpoena.

■ We hold that the evidence is sufficient to support the habeas court's finding that relator's statement was not involuntary. The prophylactic exclusionary rules of Escobedo and Miranda [5] now applicable to confessions obtained in the absence of counsel are, of course, not retroactively applicable to that confession.[6] And, as we have observed, it is doubtful that relator's counsel was in fact excluded during the time relator made his *oral* statement. The ultimate constitutional safeguard excluding confessions that are coerced in fact [7] is not applicable because of the supported finding that it was in fact not involuntary. No claim is made that relator's will was overborne by any act of his interrogator other than by exclusion of his counsel.

■ We hold that the evidence is sufficient to support the habeas court's further finding that relator's plea was made upon the advice of competent counsel and was not induced by a genuine misapprehension of his legal rights with respect to that inculpatory statement. Relator's own testimony is itself not at all clear, and the failure to produce his former counsel to corroborate his testimony militates against its credibility.[8]

Under the circumstances of this case the testimony of relator's counsel was available to either relator or the state without inhibition of the attorney-client privilege. It is true, of course, that the common-law attorney-client privilege, embodied in Minn. St. 595.02(2), provides:

"An attorney cannot, without the consent of his client, be examined as to any communication made by the client to him or his advice given thereon in the course of professional duty; nor can any employee of such attorney be examined as to such communication or advice, without the client's consent."

---

[5] Escobedo v. Illinois, 378 U. S. 478, 84 S. Ct. 1758, 12 L. ed. (2d) 977; Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. (2d) 694, 10 A. L. R. (3d) 974.

[6] State v. Sutton, 277 Minn. 157, 152 N. W. (2d) 57.

[7] Davis v. North Carolina, 384 U. S. 737, 86 S. Ct. 1761, 16 L. ed. (2d) 895.

[8] State ex rel. Terry v. Tahash, 278 Minn. 100, 153 N. W. (2d) 227.

It is equally true, however, that the client can effectively waive the privilege by conduct or affirmative consent. State v. Madigan, 66 Minn. 10, 12, 68 N. W. 179, 180; 97 C. J. S., Witnesses, § 306, and § 310, pp. 857, 861 to 862; 58 Am. Jur., Witnesses, § 526. If the defendant himself calls the attorney for that purpose, the existence of waiver is clear. Even without such express waiver, it would seem that the client impliedly waives the privilege where, as here, he himself discusses the contents of the professional communication or where, as here, he makes an attack upon the professional competence of his counsel. Annotation, 51 A.L.R. (2d) 542, § 7[b], states the majority rule that "a party waives the privilege by voluntarily testifying to communications with his counsel, particularly where the party's testimony reflected upon the attorney." In Swanson v. Domning, 251 Minn. 110, 118, 86 N. W. (2d) 716, 722, a civil case, this court quoted with approval from Steen v. First Nat. Bank (8 Cir.) 298 F. 36, 41:

"The owner of the privilege of preventing the disclosure of confidential communications cannot, after testifying to or about them, or to or about any substantial part of them, without claiming his privilege, or objecting to testify on the ground of his privilege, invoke that privilege to prevent other parties to the communications from testifying to them. He cannot by his silence lay down the shield of his privilege, and assail another with the sword of his own testimony to the privileged communications, and, when his adversary essays to defend himself, or to attack him by his version of the testimony, or by the testimony of other parties or witnesses to such communications, again seize the shield of his privilege and shut out all testimony as to the confidential communications but his own. He has waived his privilege and 'such waiver is in no sense contrary to public policy; indeed, it is in the interest of truth and justice.' "

See, also, 8 Wigmore, Evidence (McNaughton Rev. 1961) § 2327, pp. 636 to 638; A. B. A. Canons of Professional Ethics, Canon 37.

State ex rel. Fruhrman v. Tahash, 275 Minn. 242, 146 N. W. (2d) 174, is much in point. Defendant, arrested on a murder charge in 1954, had signed a written confession the day after his arrest. In his confession he stated that he was willing to answer the questions asked of him by the sheriff, despite the fact that under the Constitution he did not have to an-

swer them if he did not want to, and that no one had abused him in any way at any time. At the habeas corpus proceeding, upon his own testimony alone, he asserted that he had been physically abused by the sheriff's deputies; that he had never been advised of his right to consult with counsel; that he had not been advised that the confession could be used against him at trial; and that he had unsuccessfully requested counsel. We there said (275 Minn. 246, 146 N.W. [2d] 178):

"Defendant's confession being voluntary, it was admissible at the time of the proceedings in question, notwithstanding defendant may have been, as he now asserts he was, denied his request for counsel, or that he was not informed he could confer with counsel before making any statement. * * *

"Regardless of this, since defendant has not shown that the confession formed a basis for his conviction, the issue of its voluntariness appears to be immaterial in the present proceedings. His plea of guilty was made after consultation with counsel and after conferring with his minister in the court's chambers, where the indictment was explained to him. It also appears that his plea was made and accepted by the court without any reference to the confession."

■ We hold that the trial court did not err in accepting relator's plea of guilty, notwithstanding the following presentence statement of his counsel:

"* * * Now, there is no question about the temper of this defendant, and there is also no question about a similar temper on the part of the father. * * * Well, a struggle ensued and while the father had hold of the barrel of the gun which was an 1897 Winchester, 12 gauge gun, the father was standing outside of a shed. This shed had a cement floor which was some ten to fourteen inches higher than the ground surrounding the outside adjacent to the outside. In other words, one going from the outside to the inside of the shed would have to step up on to the concrete floor of the shed twelve or fourteen inches. In the scuffle the young man was outside and it became a pretty good fight, he tells me, and the gun was discharged. He had hold of the gun and in the process of this scuffle there was a striking of the young man in the legs and he says, he admits to me

that he went into a real rage of his own and the first shot was fired while the father was inside the shed, and the son was outside, and the charge of the shot hit the father, the main part of the shot hit him on the left cheekbone. It didn't blow his head away. It hit him in the left cheekbone, the blow going upwards so that a number of the pellets ricocheted and went into the roof boards and the rafters of the roof of the shed * * *. Then as the father, he tells me, was in a half sitting and half prone position, when the gun was reloaded, he fired the gun, the charge of shot entering the left upper abdomen and going out, the exit being somewhat below the point of entry and went clear through the father's body. Either wound, I believe, would be fatal, and he tells me that he came back to his senses and became terrorized, realizing what he had done, the gravity of it, and he went into the house, told his mother that his father had shot himself, and the mother and the boy went out and picked up the father and helped him into the house. * * *

"* * * It is a tragedy in the life of this young man and it is a tragedy that has arisen over a very very high temper on the part of the defendant, and regardless of the dispute, as I understand the criminal law, there could be no justification if this first wound could be by any stretch of the imagination to be suddenly or more properly in self-defense, the second cannot be justified even though in a rage of temper, and I am advising this young man as I have, I appreciate there can only be one sentence, but that is the only advice I can give as counsel in my duty to him as attorney and counsel to this Court so he understands the gravity of the situation, and he has a debt to pay insofar as he can pay it, and has therefore entered a plea of guilty now, whatever the sentence of the Court and now awaits the sentence of the Court."

It is settled that where a defendant, upon examination by the court after plea of guilty, states facts which would negate the existence of an essential element of the crime, a plea of guilty should not be accepted, and if made, should be withdrawn on motion of counsel or court.[9] This is particularly true where the defendant is represented by court-appointed counsel.

---

[9] State ex rel. Grattan v. Tahash, 262 Minn. 18, 113 N. W. (2d) 342; State ex rel. Dehning v. Rigg, 251 Minn. 120, 86 N. W. (2d) 723; State

The facts of this case, however, make that general principle inapplicable, for it does not appear that counsel's allocutionary statement was inconsistent with the plea of guilty. The statement of relator's counsel is more consistent with the objective of persuading the court that a plea of guilty to a lesser offense should be accepted instead of insisting upon trial of the first-degree offense for which relator was indicted.[10] What counsel stated was that the first gunshot wound, rather than the wound from the admittedly deliberate second shot, was the mortal wound.[11] Counsel did not unequivocally state that the first shot was accidental. The plea of guilty made

v. Jones, 267 Minn. 421, 127 N. W. (2d) 153; State v. Minton, 276 Minn. 213, 149 N. W. (2d) 384.

[10] The trial court in a sense expressed this view at the conclusion of the personal allocution of relator:

"Q. Well, Melvin, do you have anything that you wish to say before — to the Court before sentence is passed by the Court, anything that occurs to you that you want to say to the Court before sentence is imposed?

"A. All I can say is I ask for leniency.

"Q. Well, I think you have been well represented by counsel, Melvin. Everything has been done for you that could be done for you under the law. You have been well advised and ably represented by Counsel. The Court has no discretion in the matter. The sentence of the Court is established by law, so there is nothing that the Court can do except to impose upon you the sentence that the law embodies for this type of an offense."

[11] Based upon medical testimony taken at the preliminary hearing, the habeas court stated in its memorandum: "From what record we have, the first shot may have been accidental, but it is doubtful that the first shot was fatal. It hit the left cheekbone and went on to perforate the left side of the visor of the cloth cap he was wearing, destroying only the left side of his face and mouth. The record does not disclose that any vital organs were destroyed by the first shot.

"* * * The second shot, after the gun was reloaded, was intentional and while decedent was in a half sitting or half prone position. The second shot entered the body 'a little bit to the left of the center line and below the nipple line' and went clear through the body. That would be a vital part of the body. The second shot being intentional, the circumstances had all the necessary elements for a charge of murder in the second degree. The Court was therefore justified in accepting the guilty plea to second degree murder."

with the advice of competent counsel, shortly before this allocutionary statement, however, was an unequivocal admission of all the essential elements of the crime.

Affirmed.