**STATE of Iowa, Appellee,**

**v.**

**Willie MAYHEW, Appellant.**

**No. 53169.**

Supreme Court of Iowa.

Sept. 16, 1969.

Walter W. Rothschild, Waterloo, and Richard Knock, Cedar Falls, for appellant.

Richard C. Turner, Atty. Gen., William A. Claerhout, Asst. Atty. Gen., and Roger Peterson, Black Hawk County Attorney, Waterloo, for appellee.

GARFIELD, Chief Justice.

Following trial on a county attorney's information which accused Willie Mayhew of murder in the first degree by killing Ellis McClellan on November 4, 1967, the jury found defendant guilty of murder in the second degree in violation of section 690.3 Code 1966. From sentence on the verdict defendant has appealed.

Nine errors are assigned. They relate mainly to rulings on evidential matters although two relate to instructions to the jury. Since sufficiency of the evidence to support the verdict is not an issue, a detailed statement of the facts at the outset is not deemed necessary.

Defendant lived in a basement room in the residence of George Penn at 219 Bates Street in Waterloo. Decedent lived in a small building at the rear of the Penn home. LeRoy Dixon lived in an adjoining residence at 223 Bates. Both homes were gathering places for a number of acquaintances with a weakness for strong drink. The gatherings were larger and noisier on Saturday nights than at other times. The homicide occurred on one of these nights as the result of an argument between defendant and decedent as to whether the latter would buy the next bottle of wine. There is evidence both were intoxicated.

Dixon ordered the two men to leave his home because of the intensity of the argument and they went to the Penn home to resume the debate.

Decedent claimed to be an ex-prize fighter. When he had been drinking to excess he would go through the motions of a boxer and threaten to knock out others in the gathering. There is evidence he threatened to throw defendant on the floor and stomp on him shortly before the fatal stabbing. Defendant pulled a knife from his pocket and stabbed decedent in the chest. The knife pierced the aorta, causing massive hemorrhage which resulted in death within ten minutes. Other knife wounds were also inflicted but they were not deep. "Mims" Brown broke a wine bottle over defendant's head during the stabbing and it left a gash in his chin.

Mrs. Penn called the police who soon arrived and took defendant into custody. An ambulance was summoned to take decedent to a hospital. Defendant was taken to his doctor for treatment of the cut on his chin. While at the doctor's office the officer who took defendant there received word decedent had died and that defendant was to be brought to the police station. The officer so informed defendant when the two left the doctor's office.

Before defendant was booked at the police station the officer told him he was not required to say anything, that anything he

did say could be used in court and he could make a phone call. Defendant declined to make a phone call and said he either wanted to go to jail or go home. The officer asked defendant if he understood what he was being booked for. Defendant said there had been a fight and if he killed a man he didn't give a G_____ d_____. The officer testified there was a doubt in his mind, because defendant had been drinking and due to the manner of his speech, whether he understood what he had been arrested for, although the officer had told him as the two left the doctor's office the arrest was for murder.

**■** I. Admission in evidence of the above statement attributed to defendant is the basis for his first assigned error. A motion to suppress the evidence was made before trial commenced and overruled by the court during the trial after defendant's counsel examined the officer in the jury's absence in support of the motion. The error assigned is the ruling on the motion.

Grounds of the motion were that defendant was so intoxicated and lacking in mental capacity as to understand his rights as explained by the officers; the statement was made by defendant in response to a question by the officers if he knew what he was being booked for; defendant was not then represented by counsel nor had he consulted one, all in violation of amendments 5, 6 and 14 to the Federal Constitution. The motion did not allege the warning given defendant of his rights by the officers was incomplete.

The only testimony offered in support of the motion to suppress was from the officer (Kimball) who took defendant to his doctor, then to the police station and later testified to the statement attributed to defendant after the motion was overruled. The officer said at the hearing on the motion it was apparent defendant had been drinking but he did not know whether defendant was intoxicated. The witness gave no testimony as to defendant's mental capacity.

The trial court ruled the officer's question whether defendant understood what he was arrested for was asked in good faith, not to elicit information not called for by the question, the statement attributed to defendant was not in response to interrogation by the officer in violation of defendant's rights but, in effect, was voluntarily made and admissible in evidence.

In support of his first assigned error defendant relies on Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974.

In argument here it is pointed out defendant was not fully advised of his rights in accordance with the rule there adopted. It is true defendant had not then been told of his right to appointed counsel at public expense if he was unable to afford one. As before indicated, inadequacy of the warnings required by Miranda was not a ground of the motion to suppress. Nor was it raised as an objection to Officer Kimball's testimony before the jury nor in the motion for new trial after verdict.

**■** An objection to offered evidence must be sufficiently specific to advise the trial court why it is inadmissible. When specific objections are made that do not include the reasons urged on appeal, as a general rule the latter will not be considered. State v. Davis, Iowa, 157 N.W.2d 907, 909–910 and citations. See also State v. McClelland, Iowa, 164 N.W.2d 189, 197 and citations; State v. Brown, Iowa, 168 N.W.2d 922, 923; Carlson v. Maughmer, Iowa, 168 N.W.2d 802, 805.

We are not persuaded it was error to overrule the motion to suppress on the grounds there asserted. Inability of defendant to understand, by reason of intoxication or mental incapacity, his right to remain silent does not appear.

The question Officer Kimball put to defendant was whether he understood what he was being arrested for. The statement attributed to defendant, that he had had this fight and if he killed the man he didn't

give a G—— d——, was not an answer to the question. As the trial court found, it was in the nature of a volunteered statement. Such statements do not come within the prohibitions of Miranda.

That opinion states (page 478 of 384 U.S., page 1630 of 86 S.Ct., page 726 of 16 L.Ed.2d) "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." In further support of our conclusion see State v. Brown, Iowa, 155 N.W.2d 416, 419; State v. McClelland, supra, Iowa, 164 N.W.2d 189, 193; Haire v. State, 245 Ark. 289, 432 S.W.2d 828, 829–830.

Section 755.7 Code 1966 provides that a person making an arrest must inform the one to be arrested of the cause of the arrest. See State v. Medina, Iowa, 165 N.W.2d 777, 782. As stated, Officer Kimball testified he informed defendant what he was being arrested for as they left the doctor's office but was not sure, because he had been drinking and the manner of his speech, defendant understood him. Under these circumstances it would seem natural and proper for the officer to ask the question he put to defendant during the booking process so he could repeat the information given when the two left the doctor's office if it were not then understood.

■ II. After the state rested and defendant's motion to withdraw from jury consideration the issues of first and second degree murder was made and overruled, defendant requested authority to subpoena as a witness a psychiatrist employed by the Veterans Administration said to have examined defendant on February 8, 1963 and diagnosed him as having a chronic brain syndrome. According to defendant's counsel, it was defendant's belief the psychiatrist was located at Knoxville, Iowa. As stated at the outset, the homicide was committed November 4, 1967.

Denial of the request is assigned as the second error. The ruling was placed upon the ground defendant's counsel had asked and obtained a court order two months before the trial that defendant be sent to the State Mental Health Institute at Independence for mental examination and evaluation at county expense, with the report to be made to defendant's counsel. The ruling was placed upon the further ground the state offered no psychiatric testimony.

It appears the order sending defendant to Independence was carried out, he was examined and evaluated there for a month beginning from issuance of the order and the clinical director made a written report to defendant's counsel which he had in his file while interrogating the director as a witness at the trial.

Code section 781.2, so far as pertinent, provides: "Witnesses for the defense shall be subpoenaed at the expense of the county only upon the order of the court or judge thereof before which the case is pending, made upon a satisfactory showing that the witnesses are material and necessary for the defense, which order may be made at the time of the trial or other disposition of the case."

Constitutionality of the quoted provision was not challenged in the trial court, nor seriously here. Principal contention is it was an abuse of discretion to deny the request for the subpoena. As defendant apparently concedes and the statute indicates, the trial court has discretion as to ordering witnesses for defendant subpoenaed at county expense. See State v. Gilbert, 138 Iowa 335, 337, 116 N.W. 142. We cannot hold abuse of discretion appears here from the showing made in support of the request.

No explanation was offered for the delay in making the request. Evidently defendant's counsel was not at all sure where the psychiatrist sought to be subpoenaed was then located. The examination it is claimed was made by him occurred nearly four years and nine months prior to the homicide. The state offered no psychiatric evidence. There was no claim defendant was

insane at the time of either the homicide or the trial. Defendant examined at length as his witness the clinical director of the Mental Health Institute regarding the tests and evaluations of defendant during the month he was there.

We do not consider the two precedents defendant cites in support of this assigned error in point. They are Greenwell v. United States, 115 U.S.App.D.C. 44, 317 F.2d 108 and United States v. Davenport, 7 Cir. Ill., 312 F.2d 303.

■ III. Charles Braatz was one of three police officers who testified for the state. The other two were Kimball, referred to in the preceding division, and Witt. Braatz testified he was called to 219 Bates Street on the evening of November 4 (as stated, Mrs. Penn called the police); he went there, saw decedent sitting in a chair and observed the stab wound; 10 or 12 persons were "milling" around the house; witness and Kimball were informed the man they were looking for was in the basement; they found defendant there, bleeding from the chin; he told them "Mims" (Brown) hit him with a bottle; witness asked defendant, and was told, who his doctor was; at the top of the basement stairs witness asked defendant what happened and he stated he had cut decedent; a knife was lying in a table; someone said it was defendant's knife, witness took it and turned it over to the detective bureau; witness had no difficulty talking to defendant and he gave the officers no argument; defendant had no difficulty walking; there was a strong smell of intoxicating beverages on defendant.

On cross-examination of Officer Braatz defendant's counsel brought out that he filed a written report with the police department of his investigation. Counsel then moved that the state supply him with a copy of the report. When the motion was overruled, counsel interrogated the officer in the jury's absence in support of his motion and as an offer of proof. Braatz then said his report was filed the same night; he did not recall whether it contained a description of defendant; the report indicated he had been drinking but the officer did not believe it contained any statements as to the degree of intoxication nor know whether he reported a degree of the effect of his drinking.

At the conclusion of the interrogation in the jury's absence counsel re-urged his request for a copy of the officer's report, since he felt it imperative to determine whether the witness made any prior statements inconsistent with his testimony. The court again overruled the request and the ruling is assigned as the third error.

Defendant relies primarily upon Jencks v. United States (June 3, 1957) 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, which decided the defense in a federal criminal prosecution was entitled, under certain circumstances, to obtain, for impeachment purposes, statements made to government agents by government witnesses. Palermo v. United States, 360 U.S. 343, 345, 79 S.Ct. 1217, 3 L.Ed.2d 1287, 1292.

On September 2, 1957 the socalled Jencks Act became law as section 3500 of the Criminal Code, 18 U.S.C. In the act Congress exercised its power to define the rules that should govern in the area considered in Jencks v. United States, supra, in the trial of criminal cases in the federal courts. Palermo v. United States, supra, at pages 347–348 of 360 U.S., at pages 1222–1223 of 79 S.Ct., at pages 1292–1293 of 3 L.Ed.2d. (Provisions of the statute appear on page 1293 of the Law Edition and relevant parts of it are quoted in State v. White, 260 Iowa 1000, 1006–1007, 151 N.W.2d 552, 555, and State v. Galloway, Iowa, 167 N.W.2d 89, 92.)

The note to Jencks v. United States, supra, in 1 L.Ed.2d at 1121, states: "The impact of the Jencks decision upon the rights of defendants in federal criminal cases with respect to inspection of the records of the Federal Bureau of Investigation has been substantially lessened by federal legislation, enacted by the 85th Congress in

1957. See Public Law 269, 85th Congress, amending 18 USC ch 223."

Subsection (a) of the Jencks statute requires that no statement of a government witness made to a government agent and in its possession shall be turned over to the defense until the witness has testified on direct examination. "This (sub)section manifests the general statutory aim to restrict the use of such statements to impeachment." Palermo case, supra, at page 349 of 360 U.S., at page 1223 of 79 S.Ct., at page 1294 of 3 L.Ed.2d.

The "Jencks decision and the Jencks Act were not cast in constitutional terms. (citing the Palermo case at page 362 of 360 U.S., at page 1229 of 79 S.Ct., at page 1301 of 3 L.Ed.2d, separate opinion of Mr. Justice Brennan.) They state rules of evidence governing trials before federal tribunals; and we have never extended their principles to state criminal trials." United States v. Augenblick (1969) 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537, 545.

State v. Kelly, 249 Iowa 1219, 1221, 91 N.W.2d 562, 563, filed before either Palermo or Augenblick was decided, points out we are not bound to follow the Jencks decision but may determine for ourselves when the question is directly presented whether we will do so. While we have never adopted the procedure provided by the Jencks Act for criminal trials in federal tribunals, State v. White, supra, 260 Iowa 1000, 1007, 151 N.W.2d 552, 556 approves use of comparable procedure under the facts of that particular case. See also State v. Galloway, supra, Iowa, 167 N.W.2d 89, 91–93.

Both State v. Kelly, supra, and State v. Galloway point out the Jencks procedure, where approved, is available to a defendant after a witness has testified and for the purpose of impeachment.

We think, as a matter of fairness to defendant, comparable procedure should have been followed by the trial court here in response to his counsel's request that a copy of the written report of Officer Braatz be furnished him for use as possible impeachment of the witness by showing statements in the report inconsistent with material testimony on his direct examination by the state. Accordingly we remand the case to the district court for such purpose and direct that the state be required to produce a copy of Officer Braatz' written report to the police department on November 4, 1967 of his investigation of the crime charged.

■ The copy of the report is to be submitted to the trial court for an in camera determination, in the presence of the prosecutor and defense counsel, as to whether it or any part thereof is germane to the direct examination of the witness. If the court so finds the report or such part thereof is to be furnished to defendant's counsel for his inspection and such use thereof as he deems proper. Any question which may then arise as to the admissibility of the report or any part thereof so found to be germane to Officer Braatz' direct examination for purposes of impeachment is to be determined by the trial court in accordance with applicable rules of evidence.

■ If the court finds the report contains one or more statements inconsistent with material testimony of Braatz on direct examination which is admissible for impeachment purposes a new trial is to be ordered.

■ Defendant has the right of appeal from the ruling of the court as to whether the statement or some part thereof is to be delivered to his counsel and also refusing to admit any part of it for impeachment purposes. In such event the statement is to be preserved and certified to this court.

The above procedure is substantially that approved in Palermo v. United States, supra, 360 U.S. 343, 354, 79 S.Ct. 1217, 3 L.Ed.2d 1287, 1296, and that prescribed in State v. White, supra, 260 Iowa 1000, 1007, 1010, 151 N.W.2d 552, 556, 557.

Nothing herein is intended to conflict with anything decided or said in State v. Eads, Iowa, 166 N.W.2d 766, 774, as to furnishing defendant copies of police reports for use in preparing for trial and allegedly to afford him better assistance of counsel. See on this point and generally in connection with this assigned error State v. Schlater, Iowa, 170 N.W.2d 601 (opinion filed September 5, 1969.)

The question presented by the third assigned error is extensively discussed in Anno. 7 A.L.R.3d 181. The summary states (page 187): "As to whether the defendant in a criminal case is entitled to inspection of a prosecution witness' statement for purposes of cross-examination or impeachment after the witness has testified on direct examination, the general views followed by the state courts are divided."

The annotation supra, pages 190–193, cites cases from 13 states for the proposition that ordinarily, after a prosecution witness has testified on direct examination, defendant is entitled to inspect prior statements of the witness for the purpose of cross-examining or impeaching him. However, cases from 18 states and the District of Columbia are cited (pages 198–200) for the proposition that ordinarily a defendant is not entitled to inspect such a statement for such purposes. See also precedents in Later Case Service.

■ IV. As stated, defendant examined at length as his witness the clinical director of the Mental Health Institute as to the tests and evaluations of defendant during the time he was there under court order. In cross-examining the witness (Dr. Oestreicher) the prosecutor brought out that he sent defendant's counsel a report of the tests and evaluations and the witness had a copy of the report. When the prosecutor asked if he could look at it, defendant's counsel stated he felt the report was confidential and he could not make it available. No other objection was made. After off-the-record discussion between court and counsel, the objection was overruled and the ruling is assigned as error. We think there are two answers to this assignment.

If the objection of defendant's counsel was good it must be because the physician-patient privilege under Code section 622.10 existed between Dr. Oestreicher and defendant. It is settled no such privilege existed at common law. This statute provides: "No practicing * * * physician, * * * who obtains such information by reason of his employment, * * * shall be allowed, in giving testimony, to disclose any confidential communication properly entrusted to him in his professional capacity, and necessary and proper to enable him to discharge the functions of his office according to the usual course of practice or discipline. Such prohibition shall not apply to cases where the party in whose favor the same is made waives the rights conferred."

The physician-patient privilege does not arise where on order of the court a defendant is examined to determine his mental or physical condition. Taylor v. United States, 95 U.S.App.D.C. 373, 222 F.2d 398, 401–403; State v. Emerson, 266 Minn. 217, 123 N.W.2d 382, 386–387; State v. Fouquette, 67 Nev. 505, 221 P.2d 404, 421, cert. denied 341 U.S. 932, 71 S.Ct. 799, 95 L.Ed. 1361; Koonce v. State, Okl.Cr., 456 P.2d 549, 561–563; State v. Sullivan, 60 Wash. 2d 214, 373 P.2d 474, 480–481; Simecek v. State, 243 Wis. 439, 10 N.W.2d 161, 165; 8 Wigmore Evidence, McNaughton Rev. § 2383; 97 C.J.S. Witnesses § 294, pages 828–829.

The cited cases distinguish between an examination of a defendant solely to ascertain his mental and physical condition as opposed to diagnosis and treatment. Only in the former situation is the privilege unavailable, in the latter situation the defendant still can invoke the privilege. "This significant distinction is noted in the general rule as stated in Wharton's Criminal Evidence, Twelfth Ed., vol. 3, section 818, page 171, as follows: 'The privilege does not arise where an examination of a person is made to determine the existence

of a fact or condition, as distinguished from giving him medical treatment. Thus, the privilege does not arise, and a physician may testify as to the result of an examination made for the sole purpose of seeing whether the condition of the patient indicated the commission of the crime, or whether the defendant was sane * * *.'" Koonce v. State, supra, 456 P.2d at 562.

If we assume the physician-patient privilege under Code section 622.10 existed between Dr. Oestreicher and defendant and the doctor could not have been compelled to testify to his examination and evaluation of defendant or report thereof, it must be held the privilege was waived by calling the doctor as a witness and the direct examination of him. The statute itself provides the prohibition against such testimony shall not apply where the patient waives the rights conferred. We therefore find no error under the fourth assignment for this added reason.

Supporting authority for our view any privilege was waived includes Woods v. Town of Lisbon, 150 Iowa 433, 435–436, 130 N.W. 372, 373 and citations; Whitmore v. Herrick, 205 Iowa 621, 630–1, 631, 218 N.W. 334; Barnard v. Cedar Rapids City Cab Co., 257 Iowa 734, 750, 133 N.W.2d 884, 895; Prof. Craig T. Sawyer "The physician-patient privilege," 14 Drake Law Review 83, 90; 97 C.J.S. Witnesses § 310 a, pages 856–857, § 310 d, pages 863–864; 58 Am.Jur., Witnesses, section 450. Kelly v. Cummens, 143 Iowa 148, 151–152, 121 N.W. 540 and State ex rel. Schuler v. Tahash, 278 Minn. 302, 154 N.W.2d 200, 205 are like decisions as to waiver of the attorney-client privilege under the same or a similar statute.

V. Error is assigned in admitting over defendant's objection evidence of alleged non-specific threats by him.

Evidence of threats to injure or kill or expressions of hostility toward the person injured or killed, or against a class which includes such person, is admissible in a criminal prosecution to show intent, malice or motive of accused. State v. Thompson, 127 Iowa 440, 441, 103 N.W. 377, 378; State v. Nott, 168 Iowa 617, 620, 149 N.W. 79, 80; Bennefield v. State, 281 Ala. 283, 202 So.2d 55, 58; People v. Poland, 22 Ill. 2d 175, 174 N.E.2d 804, 808; Peoples v. State, 83 Nev. 115, 423 P.2d 883, 884, cert. den. 389 U.S. 866, 88 S.Ct. 132, 19 L.Ed.2d 138; Belton v. Commonwealth, 200 Va. 5, 104 S.E.2d 1, 3; 3 Underhill's Criminal Evidence, Fifth Ed., section 650, page 1568; 22A C.J.S. Criminal Law § 607.

40 Am.Jur.2d, Homicide, (1968) section 316, page 587, contains this: "According to a number of courts, evidence of threats made by the accused may be admissible even though they were of a general and indefinite nature, especially when made shortly before the commission of the crime to which they may be construed to have reference, although it is a matter of inference whether the deceased came within the scope of such threats; * * *"

40 C.J.S. Homicide § 206 c, pages 1110–1111, cites many decisions for this: "Thus a general threat to kill or injure someone, not definitely designated, is admissible when other facts adduced give individuality to it so that * * * the jury may infer that the threat referred to deceased, or when the threat was made shortly before the commission of the crime to which it may be construed to refer."

Our cases of State v. Nott, supra, and State v. Windahl, 95 Iowa 470, 472, 64 N.W. 420, may be cited as authority for both statements just quoted.

Over defendant's objection as improper, incompetent, irrelevant, immaterial and indefinite as to time and place, Mr. Penn (defendant's landlord) was permitted to testify that two or three months before the homicide he heard defendant say more than once something about killing someone; when witness asked defendant why he was going to kill someone, he said people mistreat him, run over him and he is getting

tired of it. Another witness testified, over a like standing objection, he heard defendant say within a month before the stabbing if somebody keeps "messing" with him he was going to kill somebody; when defendant made the statement witness thought the former was pretty sober; witness testified he heard defendant say on several occasions, the last a few days before it happened, if people didn't quit "messing" with him he was going to kill someone.

Immediately after defendant stabbed decedent he went from near the front door of the Penn dwelling to the stairway leading to his basement room. As he passed a girl who lived with the Penns, according to her testimony, defendant said he was going to kill somebody else. (As before explained, "Mims" Brown broke a wine bottle over defendant's head during the stabbing.)

There is much testimony to warrant the inference decedent was "messing" with and mistreating defendant at and before the time of the homicide. The girl witness testified that just before the stabbing decedent was teasing accused by saying he was going to throw him to the floor and stomp on him, and when accused took the knife from his pocket the blade was already open. Thus it could properly be found decedent was within the class to which the threats referred and also that they were made so shortly before the stabbing as to refer to it.

The only ground of objection to this testimony argued here is that the threats were not directed at decedent or a class which included him. It is not contended the threats were so remote in time the evidence should not have been admitted. We thus have no occasion to cite authorities for the rule that generally the remoteness of the threats goes to the weight of the evidence thereof, rather than its admissibility. See, however, Wigmore on Evidence, Third Ed., section 108, pages 544–545; 3 Underhill's Criminal Evidence, Fifth Ed., section 650, page 1573; State v. Hoyeson, 154 Conn. 302, 224 A.2d 735; People v. Parker, 8 Mich.App. 414, 154

N.W.2d 615, 617; Carroll v. State, Miss., 196 So.2d 878, 881.

It is doubtful at best if the general objection mentioned above to evidence of threats was sufficient to alert the trial court to the ground of objection now relied on. See Linge v. Iowa State Highway Comm., 260 Iowa 1226, 1231–1232, 150 N.W. 2d 642, 645–646 and citations. However, as may be inferred, we have chosen to disregard the point.

VI. We find no merit in defendant's sixth assignment that the court erred in excluding psychiatric testimony from Dr. Oestreicher relating to defendant's ability to form intent to inflict injury prior to the act and understand its nature and probable consequences. The prosecutor evidently regarded the one question to which objection was sustained as an attempt to show defendant was insane when no such issue was tendered. However, as shown by the amended abstract, the witness was permitted to answer virtually the same question at the conclusion of his direct examination.

The question last referred to was whether the witness could say with reasonable medical and psychiatric certainty whether defendant could have formed the intent to inflict injury prior to committing the act. The doctor interrupted asking of the question before it was quite completed by saying "No, I cannot answer that in any positive way." With this defendant's counsel announced he had no further questions.

There is nothing to indicate the earlier question would have been answered differently. On redirect examination of the witness it was brought out that intoxication would bear directly on defendant's ability to form a specific intent, especially in view of his mental condition; both factors increased the chances for impulsive action. No prejudice could have resulted from sustaining the objection to the prior question on direct examination.

VII. Defendant's seventh assignment is even more clearly without merit. It is based on an objection to the definition of "to deliberate" in jury instruction 6. The definition was that it "is to weigh in one's mind, to consider." This is the exact definition found in Instruction 513.2 of Uniform Jury Instructions prepared by a committee of the Iowa State Bar Association. Defendant objected to the quoted definition by asking there be added at the end the words "in a cool and reflective manner."

The most obvious answer to this assignment is that the definition related only to first degree murder and since defendant was found guilty of murder in the second degree he was not prejudiced by overruling the objection. State v. Jiles, 258 Iowa 1324, 1338, 142 N.W.2d 451, 459; State v. Shipley, 259 Iowa 952, 959–960, 146 N.W. 2d 266, 270–271.

VIII. The error assigned in the definition of murder in the second degree in jury instruction 11 was without prejudice to defendant. It was "whoever kills another human being with malice aforethought, but without willful deliberation and premeditation is guilty of murder in the second degree." This is Instruction 513.4 of Uniform Jury Instructions referred to in Division VII, supra. The objection to the instruction was that the words "and a specific intent to kill" should have been inserted between "premeditation" and "is guilty."

Instruction 7 defines first degree murder in the language of Code section 690.2 and Uniform Jury Instruction 513.3 as "All murder perpetrated by willful, deliberate and premeditated killing * * *."

Instruction 8 states the essentials of first degree murder the state must prove to warrant a verdict of guilty thereof. It adds to the requirements of "wilfully, deliberately and premeditatedly" "a specific intent to kill", not found in section 690.2, Uniform Instruction 513.3 or Instruction 7. However, the words last quoted are found in Uniform Instruction 513.13, doubtless because we have held several times a specific intent to kill is essential to murder in the first degree but not to murder in the second degree. State v. Johnson, 211 Iowa 874, 879, 234 N.W. 263 and citations.

"A specific intent to kill is not essential to the crime of murder of the second degree." State v. Leedom, 247 Iowa 911, 916–917, 76 N.W.2d 773, 776 and citations; State v. Drosos, 253 Iowa 1152, 1164, 114 N.W.2d 526, 533.

The argument in support of the objection to instruction 11 is that since it does not state a specific intent to kill (as well as willfulness, deliberation and premeditation) is not essential to second degree murder it would inferentially lead the jury to believe, contrary to our decisions, it was essential. In other words, it is said instruction 11 required proof of a proposition the law does not require. It is obvious that if error was committed in this respect it was error against the state, not against accused and affords him no cause for complaint.

IX. Finally, defendant assigns as error some claimed erroneous rulings on admission of opinion evidence.

A police officer identified a photograph taken by him showing the floor underneath the chair in which decedent was seated soon after the stabbing occurred. He was asked whether the blood spot shown in the exhibit, from his observation, was wet or dry when he arrived. His answer was it was dry. No objection was made to the question and it is conceded the answer was proper.

The same witness was then asked if he could tell from his observation whether the blood stain was fresh. Over defendant's objection the question called for an opinion and conclusion and no proper foundation laid, the officer first said he would say it was fresh. Asked if he could tell, the witness answered there was no way of telling whether it was fresh. We find no error in the ruling and, in view of the sec-

ond answer, no prejudice to defendant therefrom.

Over defendant's objection the question called for the witness' opinion and conclusion, the state asked Robert Davis whether decedent was a mean type person. The answer was "As far as I know, he wasn't mean." Davis said he had known both decedent and defendant about two years and had frequent contacts with them.

In argument it is said the inquiry, if proper at all, should have related to decedent's reputation in the community for the particular trait in question. It is conceded, however, we have permitted a qualified witness to testify directly to the real character of a defendant or other witness. It is also argued the state could not offer testimony decedent was not mean except in rebuttal of evidence offered by defendant to the effect decedent was mean or violent.

■ Neither argument made here in support of this claimed error was suggested to the trial court. Sole objection there was that the question called for an opinion and conclusion. As stated in Division I, supra, when specific objections are made to offered evidence that do not include the reasons urged on appeal, as a general rule the latter will not be considered. See cases there cited.

■ Our decisions make it clear the receipt of opinion evidence, whether lay or expert, rests largely in the trial court's discretion and we are loath to interfere with the exercise thereof unless it has been manifestly abused to the prejudice of the complaining party. Grismore v. Consolidated Products Co., 232 Iowa 328, 342, 5 N.W.2d 646, 654; State v. Mabrey, 245 Iowa 428, 431–432, 60 N.W.2d 889, 891; State v. Jiles, supra, 258 Iowa 1324, 1330, 142 N.W.2d 451, 455. We find no such abuse of discretion in the ruling complained of.

■ A common test to determine whether a ruling on the admission of evi-

dence was prejudicial is whether, upon a review of the record, it sufficiently appears the rights of the complaining party have been injuriously affected by the error or he has suffered a miscarriage of justice. State v. Wallace, 259 Iowa 765, 771–772, 145 N.W.2d 615, 619 and citations.

On the matter of prejudice to defendant from the ruling in question, we note very similar evidence offered by the state was received without objection. A witness who had known both decedent and defendant about three years said the former was not a violent type person. The single answer of the witness Davis added little, if anything, to this evidence and was not sufficiently prejudicial to warrant reversal. State v. Mabrey, supra, 245 Iowa 428, 432–433, 60 N.W.2d 889, 892 and citations; Iowa Development Co. v. Iowa State Highway Comm., 252 Iowa 978, 989, 108 N.W.2d 487, 494 and citations. See also 5A C.J.S. Appeal and Error § 1731, pages 1012–1015.

■ A witness for the state, fully cross-examined by defendant as to the state of intoxication of both decedent and defendant, testified both were pretty drunk. Asked who was the more so, the witness answered he could not tell. Asked if they appeared to be equally drunk, the witness answered "Yes". The state's objection was overruled. Asked to repeat his answer, the witness again said "Yes" and added that if defendant had not been drunk he would not have gone downstairs and gone to sleep. The state moved to strike "that" as not responsive to the question and an opinion and conclusion. Defendant complains of the sustaining of the motion.

As we view the record, both affirmative answers remained in the record. Only the witness' opinion added to the second answer was stricken. We find no abuse of discretion in this ruling.

Defendant's physician was asked if the officers who accompanied defendant viewed "it" as a serious situation. The state's objection was sustained as a conclusion but

the court ruled the witness could tell what he saw or heard. Defendant then asked the doctor what he saw or heard "in this respect." The state's objection was overruled and the answer was: "The police had a sense of humor, let us say, about the whole thing because to some people an inebriated person like him * * * is rather humorous or funny." On the state's motion the answer was stricken as irrelevant and immaterial. The ruling is the final complaint defendant makes.

We are told counsel's purpose in asking these questions was to show defendant was extremely drunk *and* the police viewed his condition with amusement. The witness testified fully as to defendant's intoxication both on direct and redirect examination and the questions and answers last referred to added virtually nothing to the voluminous evidence on that subject. It is not apparent the claimed fact the officers viewed the situation as humorous was material or relevant.

We have considered all errors assigned and find no sufficient ground for reversal at this time, but remand the case to the trial court as explained in Division III, pages 10 and 11, supra, with the directions therein stated.

Remanded with directions.

LARSON, SNELL, MOORE, STUART and MASON, JJ., concur.

BECKER, RAWLINGS and LeGRAND, JJ., dissent.

BECKER, Justice.

I respectfully dissent.

I. I agree with the holding in Division III that defendant is entitled to receive, examine and use for impeachment purposes prior statements of prosecution witnesses. However, I do not agree that such right is subject to prior *in camera* determination by the trial court of relevancy and admissibility of the contents of the report. This is especially unfair where, as here, the State makes no claim the report contains anything which would in any way prejudice its law enforcement function. The Arizona supreme court in State v. Ashton, 95 Ariz. 37, 386 P.2d 83, 84, analyzes the matter correctly: " * * * It is not this court's province to inquire into the possibilities for impeaching the officer's testimony from information contained in his narrative report. We cannot speculate as to what use might have been made of it by defense counsel. Clancy v. United States, 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961). This is a matter which can only be determined by defense counsel, who is entitled to make his independent evaluation from examining the narrative report after hearing the direct testimony of the State's witness. To require defense counsel to show a conflict between the witness' direct testimony and the narrative report, without having seen the report would be to require the impossible. For until the trial judge accords him an opportunity to inspect the report, defense counsel will have no knowledge of its contents. State v. Lavallee, 122 Vt. 75, 163 A.2d 856 (1960). Neither can an appellate court make assumptions as to how an effective use of the narrative report would have affected the witness' credibility in the eyes of the jury."

This is simply another way of saying the responsibility for the defense of an accused is on defense counsel, not on the judge, and the judge, in the absence of compelling social reasons for the State's protection, has no business prejudging the materiality of the admissibility of the evidence.

No such *in camera* restriction is put on the State's use of the psychiatric report made available to the State in Division IV. Why then, in the absence of special circumstances shown by the State, should the trial judge be required to prescreen the police report?

What was said by way of special concurrence in State v. Eads, Iowa, 166 N.W.

2d 766, 775, seems to me to apply even more strongly at trial than at the pretrial stage.

This *in camera* type inquiry was at first accepted by the Supreme Court of the United States as indicated by the majority. At least as to electronic surveillance, that court has now concluded such a rule is unworkable, Alderman v. United States, 394 U.S. 165, 88 S.Ct. 961, 22 L.Ed.2d 176 (March 10, 1969). While the reasoning is not controlling as to the situation we have here, the majority opinion by Mr. Justice White recognizes the ultimate responsibility to determine the usability of the evidence is on counsel, not the court. We should not go through the same exploratory steps when the way is so clearly pointed by cases preceding and including the Alderman case.

II. I do not understand the procedure. If the trial court examines the report in question *in camera* and decides the material contained therein does not contain "one or more statements inconsistent with the material testimony of Braatz on direct examination which is admissible for impeachment purposes", what happens next? The majority holds the material is to be certified to this court. Is defense counsel entitled to argue the matter in this court? Is he expected to so argue without knowledge of the contents of the report or statement?

Requiring such a "blind" procedure will make it incumbent upon conscientious counsel to appeal every such ruling since he cannot otherwise discover if good cause therefor exists.

III. What if the statement contains material inconsistent with statements made by Braatz on cross-examination? According to the majority this material would not be available.

Suppose the report contains material not usable on cross-examination but arguably beneficial to defendant, either as found in the report or by additional investigation? Wouldn't such a situation require divulging

such information to defendant under the doctrine set forth in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215?

It is submitted the only reasonable ruling in this case is that a fair trial was denied when defendant was denied access to the information requested. This necessitates a new trial.

RAWLINGS, J., joins in this dissent.

LeGRAND, J., joins in Division II of this dissent.